

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

# FILED

MAY 2 4 2005

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

| | |
|---|---|
| JPMORGAN CHASE BANK, N.A., SUCCESSOR ) | |
| BY MERGER WITH BANK ONE, N.A., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 05 C 2978 |
| ) | Judge Guzman |
| EZZAT KHALIL, et al. ) | Magistrate Judge Keys |
| ) | |
| Defendants. ) | |

## UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF ITS
## MOTION TO DISMISS COMPLAINT TO FORECLOSE MORTGAGE

The United States of America, by Patrick J. Fitzgerald, United States Attorney for the

Northern District of Illinois, submits this memorandum in support of the federal defendant's motion

to dismiss JPMorgan Chase Bank's ("JPMorgan") Complaint to Foreclose Mortgage.

### Background

On or about April 13, 2005, JPMorgan filed its complaint to foreclose its mortgage against

the real property commonly known as 9511 Massasoit, Oak Lawn, Illinois (the "Oak Lawn

Property"). JPMorgan's complaint joined the United States to terminate the federal government's

interest, alleging that:

> 6. The following persons have, or claim to have some right, title, and interest in the
> mortgaged property, and are therefore made parties defendant to this proceeding, but their
> right, title and interest, if any, is subject and subordinate to the lien of Plaintiff herein:
>
> * * *
>
> (c) UNITED STATES OF AMERICA, by virtue of whatever interest it may claim
> in the above described property as revealed by a lis pendens notice recorded in the
> Recorder's Office of Cook County, Illinois as Document No. 0310731071 issued to
> orders entered in a Grand Jury Investigation, 02 GJ 478 and 03 GJ 478 pending in the
> United States District Court, Northern Division, Eastern District.

(Complaint at ¶ 6 (c); Exhibit "A"). In the complaint, Ezzat Khalil is alleged to be the titleholder and mortgagor of the Oak Lawn Property. (Complaint at ¶ 1; Exhibit "A").

On July 15, 2003, an indictment was filed in the case of *United States v. Ezzat Khalil, et al.,* 03 CR 386 ("Criminal Case"). (See Exhibit "B"). The indictment included allegations for the criminal forfeiture under 21 U.S.C. § 853 (a) of the Oak Law Property. (Exhibit "B" at 21). On April 17, 2003, a *Lis Pendens* notice, providing public notice of the forfeiture of the real property, was recorded with the Cook County Recorder of Deeds as document number 0310731071. (See Exhibit "C"). On August 5, 2003, a superseding indictment was filed in the Criminal Case, which repeated the criminal forfeiture allegations of the Oak Lawn Property under 21 U.S.C. § 853. (See Exhibit "D" at 22).

On May 19, 2005, less than thirty days after the United States Attorney was served with JPMorgan's complaint, the United States removed this foreclosure case from the Circuit Court of Cook County, Illinois.

### Argument

*Standard for Motions Under Federal Rule 12(b)(1)*

In ruling on a motion to dismiss under Rule 12(b)(1), Fed. Rules Civ. Proc., "The district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Capitol Leasing Co. v. F.D.I.C.,* 999 F.2d 188, 191 (7th Cir. 1993). Such evidence on the issue of jurisdiction can be supplied by the court taking judicial notice of publicly recorded documents. *General Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1081 (7th

Cir.1997). The *Lis Pendens*, and the indictment are publicly recorded documents to which judicial notice can be taken.

*JP Morgan's Foreclosure Case is Barred.*

JPMorgan's complaint seeks the termination of the United States' interest in the Oak Lawn Property. (Complaint at ¶ 6 (c)). Such relief is barred by 21 U.S.C. § 853(k)(2).

Section 853(k)(2) provides that,

> Except as provided in subsection (n) of this section, no party claiming an interest in property subject to forfeiture under this section may--
> (1) * * *
> (2) commence an action at law or equity against the United States concerning the validity of his alleged interest in the property subsequent to the filing of an indictment or information alleging that the property is subject to forfeiture under this section.

21 U.S.C. §853(k)(2).

In construing § 853(k)(2), that subsection must be read together with § 853(n). Subsection § 853(n) states that after property is forfeited to the United States any third party who claims an interest in forfeited property must petition the criminal court for an adjudication of the validity of its interest in the forfeited property. 21 U.S.C. § 853(n). Accordingly, §§ 853(k)(2) and 853(n) establishes a statutory framework by which the forfeiture court become the exclusive court for litigating interests in a property once subject to criminal forfeiture allegations.

To preserve the focus of § 853(n), § 853(k)(2) has been consistently applied to bar the commencement of a case to establish entitlement to property when there is a pending criminal case seeking the forfeiture of that same property. *United States v. De Ortiz*, 910 F.2d 376 (7th. Cir. 1990); *Roberts v. United States*, 141 F.3d. 1468 (11th Cir. 1998). When challenges to the

3

government's interest in forfeitable property have been brought outside of the criminal forfeiture proceedings, those collateral cases have been dismissed. *Roberts,* 141 F.3d. at 1471.

In both *De Ortiz* and *Roberts*, claimants competing with the United States' criminal forfeiture sought to establish their entitlement in proceedings other than the criminal forfeiture proceeding. However, because the claimant's actions were commenced after forfeiture allegations of the indictment had been made against the disputed property, both the Seventh and Eleventh Circuit Courts affirmed that 21 U.S.C. § 853(k)(2) barred the collateral actions. (See also, *United States v. Security Marine Credit Corporation*, 767 F. Supp. 260 (S.D. Fla. 1991) and *In re Smouha*, 136 B.R. 921 (S.D. N.Y. 1992). Thus, § 853(k)(2) has been consistently construed as part of the statutory scheme that requires third party challenges to the government's criminal forfeitures to be raised only in the forfeiture proceeding.

The fact that the competing claimants action is a mortgagee's foreclosure has not altered the application of § 853(k)(2). A mortgagee's foreclosure of property already subject to a pending criminal forfeiture has been consistently barred by § 853(k)(2). *Bank One, N.A. v. Everly,* 2002 WL 31056716 (N.D. Ill. Sept.13, 2002) (Judge Darrah); *Bank of New York v. Rogers*, 02 C 5045, United States District Court, Northern District of Illinois (Judge Guzman); *Liberty Federal Bank v. JCJ Ventures, Inc.*, 00 C 6419, United States District Court, Northern District of Illinois (Judge Conlon) (See Group Exhibit "E").

Because JPMorgan's foreclosure was filed after the federal government made forfeiture allegations in the indictment against the Oak Lawn Property, § 853(k)(2) bars the foreclosure. On July 15, 2003, the United States made its criminal forfeiture allegations against the Oak Lawn Property in the indictment filed in the Criminal Case. (Exhibit "C"). Thereafter, on April 20, 2005,

4

JPMorgan commenced the case for the foreclosure of the Oak Lawn Property. Therefore the dismissal of JPMorgan's foreclosure is consistent with the statutory scheme of § 853, requiring third party claims against property that is already the subject of a criminal forfeiture to be resolved within the framework of the Criminal Court. Under § 853(n), JPMorgan may petition the court in the Criminal Case to assert its mortgage claim and to challenge the validity government's interest.

### Conclusion

For the foregoing reasons, JPMorgan's complaint for the foreclosure of the Oak Lawn Property should be dismissed.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By: JOEL NATHAN
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-8449

5

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT - CHANCERY DIVISION**

JPMORGAN CHASE BANK, N.A.              )
SUCCESSOR BY MERGER WITH              )
BANK ONE, N.A.                         )
                                       )
                          Plaintiff,   )
                                       )   No.
              vs.                      )
                                       )
EZZAT KHALIL;                          )
NADYA KHALIL;                          )
STATE OF ILLINOIS;                     )
FIRST SELECT, INC.;                    )
UNITED STATES OF AMERICA;             )
                                       )
                          Defendants.) )

**SUMMONS - COPY**

To each defendant:

**YOU ARE SUMMONED** and required to file an Answer to the Complaint in this case, a copy of which is hereto attached, or otherwise file your Appearance in the office of the Clerk of this Court (located in the Richard J. Daley Center, Room 802, Chicago, Illinois 60602), within 30 days after service of this Summons, not counting the day of service. **IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF ASKED IN THE COMPLAINT, A COPY OF WHICH IS ATTACHED.**

To the officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

| |
|---|
| There will be a fee of $143.00 to file your Appearance, or you may present an application to Sue or Defend as a Poor Person (form #CCG-19). If approved by the Presiding Judge, the fee will be waived |

WITNESS, ~~APR 13 2005~~ , 20__

_____
Clerk of the Court

Date of Service: __4|20__ , 20 05
(To be inserted by an officer on copy left with defendant or other person)

KROPIK, PAPUGA & SHAW
Attorney for Plaintiff
120 South LaSalle Street
Chicago, Illinois 60603
312/236-6405
Attorney No. 91024

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**



GOVERNMENT
EXHIBIT

A

Cook County Firm I.D. No. 91024

## IN THE CIRCUIT COURT OF COOK COUNTY ILLINOIS
### COUNTY DEPARTMENT - CHANCERY DIVISION

JPMORGAN CHASE BANK, N.A.　　　　　)
SUCCESSOR BY MERGER WITH　　　　　)
BANK ONE, N.A.　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　Plaintiff, )　　No.
　　　　　　　　　　　　　　　　　　)
　　　　　　　vs.　　　　　　　　　　)
EZZAT KHALIL;　　　　　　　　　　　)
NADYA KHALIL;　　　　　　　　　　　)
STATE OF ILLINOIS;　　　　　　　　)　　05C      53
FIRST SELECT, INC.;　　　　　　　　)
UNITED STATES OF AMERICA;　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　Defendants.)

### COMPLAINT TO FORECLOSE MORTGAGE

Plaintiff above-named, by KROPIK, PAPUGA and SHAW, its

attorneys, says:

　　　　　1.　On MARCH 15, 2000

　　　　　　　　EZZAT KHALIL and NADYA KHALIL,

executed and delivered a note payable to the order of

　　　　　　　　BANK ONE, N.A.

in the principal sum of $ 48,870.00, with interest, and to secure the

payment of said note, executed, acknowledged and delivered to plaintiff

a mortgage of even date, which was filed for record in the Recorder's

Office of Cook County, Illinois, on MARCH 30, 2000 as Document

Number 00222237 thereby conveying to plaintiff the property

described in Exhibit "A", which is attached hereto and made a part

hereof.

　　　　　2. Plaintiff is now the holder and owner of said note and

mortgage copies of which are attached to this Complaint as Exhibits 1

and 2, and incorporated herein by reference. part hereof.

- 1 -

3. Default has been made in the payment of the installments due under the terms of said note for more than three months, by reason whereof, Plaintiff declared the principal and interest immediately due and payable. The unpaid principal balance is $ 47,171.83 with interest accruing from NOVEMBER 10, 2004 at the rate of 10.34 per day or otherwise as set forth in said note.

4. Sums expended for attorney's fees, taxes, fire insurance premiums and costs of this proceeding, shall be so much additional indebtedness secured by said mortgage.

5. The mortgaged property is scant and inadequate security for the debt due herein, and for such reason, a Receiver, or a Mortgagee in Possession should be appointed.

6. The following persons have, or claim to have some right, title, and interest in the mortgaged property, and are therefore made parties defendant to this proceeding, but their right, title and interest, if any, is subject and subordinate to the lien of Plaintiff herein:

(a) EZZAT KHALIL
as record title owners(s) of the above described property.

(b) NADYA KHALIL, by virtue of his\her interest in the above described property, either as the spouse of EZZAT KHALIL, or otherwise.

(c) UNITED STATES OF AMERICA, by virtue of whatever interest it may claim in the aboce described property as revealed by a lis pendens notice recorded in the Recorder's Office of Cook County, Illinois as Documnet No. 0310731071 issued to orders entered in a Grand Jury Investigation, 02 GJ 478 and 03 GJ 478 pending in the United States District Court, Northern Division, Eastern District.

(d) FIRST SELECT, INC.
by virtue of a Judgment entered in its favor in the Circuit Court of COOK County, Illinois, Case No. 99 M1 161676, against YOUSET H. MAHMOND in the amount of $ 16,917.75 a memorandum of which was recorded in the Recorder's Office of COOK County, Illinois, as Document No.0010525250 on JUNE 15, 2001.

- 2 -

(e) THE STATE OF ILLINOIS, by virtue of a lien in its favor recorded in the Recorder's Office of COOK County, Illinois on MAY 31, 2000, as Document No.00390167 in the amount of $ 562.08, against EZZAT KHALIL.

WHEREFORE, Plaintiff prays (a) that an account be taken of the amount due and owing to Plaintiff, including attorney's fees and other costs and disbursements made in connection with this proceeding; (b) that the defendants, or either of them, be directed to pay to Plaintiff whatever sum shall appear to be due to Plaintiff upon the taking of such account by a short date; (c) that in default of such payment, the mortgaged property may be ordered sold to satisfy said indebtedness; (d) that in case of failure to redeem pursuant to statute, the defendants, and each of them, and all parties claiming through or under them, may be forever barred and foreclosed of and from all right or equity of redemption and claims to said property; (e) that in case the proceeds of such sale be not sufficient to pay in full the amounts found due to the Plaintiff, a deficiency Judgment may be entered in favor of the Plaintiff and against such defendants as may be found personally liable to pay the same and who have not previously been discharged in bankruptcy, and that execution be issued thereon; (f) that a Receiver be appointed with the usual powers of Receivers in like cases, or that the Plaintiff, as mortgagee, be placed in possession of the above-described property; (g) that Plaintiff may have such other relief as may be equitable.

_____
Attorney for Plaintiff

KENNETH K. SHAW JR.
KROPIK, PAPUGA & SHAW
Attorneys for Plaintiff
120 South LaSalle Street
Chicago, Illinois 60603
Telephone: 312/236-6405
ARDC # 02571765

- 3 -

Re: KHALIL

## LEGAL DESCRIPTION

. THE NORTH 1/2 OF LOT 6 IN BLOCK 3 IN FREDERICK H. BARTLETT'S
. CENTRAL WOOD, BEING A SUBDIVISION IN THE EAST 1/2 OF SECTION 8,
. TOWNSHIP 37 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN,
. IN COOK COUNTY, ILLINOIS.
.
.
.
.
.
.
.
.
.
.
.
.
.
.

SAID PROPERTY IS COMMONLY KNOWN AS: 9511 Massasoit
                                    Oak Lawn, IL 60453

PERMANENT TAX NO.: 24-08-204-014
.
.

EXHIBIT 'A'

- 4 -

Re: KHALIL

## NOTICE TO CONSUMER PURSUANT TO
## FEDERAL FAIR DEBT COLLECTION PRACTICES ACT

1. Amount of debt. As of the date of the preparation of the attached complaint, APRIL 12, 2005, you owe $ 49,027.56. Because of interest, late charges, and other charges that may vary from day to day, the amount due on the day you pay may be greater. Hence, if you pay the amount shown above, an adjustment may be necessary after we receive your check, in which event we will inform you before depositing the check for collection. For further information, write or call the law firm of Kropik Papuga & Shaw at the address or telephone number contained in the attached Complaint.

2. The name of the creditor is the named Plaintiff in the attached complaint.

3. Unless you notify us within 30 days after receipt of this Notice that you dispute the validity of the debt set forth in the attached complaint, or any portion thereof, we will assume that the debt is valid. If you notify us in writing within said 30 day period that the debt or any portion thereof is disputed, we will obtain verification of the debt and a copy of such verification will be mailed to you.

4. Upon your written request within 30 days after receipt of this notice, we will provide you with the name and address of the original creditor if it is different from the Plaintiff named in the attached complaint.

5. This is an attempt to collect a debt and any information obtained will be used for that purpose.

6. Nothing in this notice is to be construed as an agreement by the Plaintiff to extend or stay any time periods established by law with respect to the litigation which is the subject of the attached complaint.


**BANK≡ONE.**

# BANK ONE HOME EQUITY LINE OF CREDIT sm
## AGREEMENT AND DISCLOSURE STATEMENT

| Principal | Loan Date | Maturity | Loan No. | Call | Collateral | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|---|
| $48,870.00 | 03-15-2000 | 03-15-2015 | | | | 4511069046 | | |

References in the shaded area are for our use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

Borrower:   EZZAT KHAUL
            9511 MASSASOIT
            OAK LAWN, IL 60453

Lender:   Bank One, N.A.
          100 East Broad Street
          Columbus, OH 43271

**CREDIT LIMIT: $48,870.00**

**DATE OF AGREEMENT: March 15, 2000**

Introduction. This BANK ONE HOME EQUITY LINE OF CREDIT AGREEMENT AND DISCLOSURE STATEMENT ("Agreement") governs your line of credit (the "Credit Line" or the "Credit Line Account") issued through Bank One, N.A.. In this Agreement, the words "Borrower," "you," "your," and "Applicant" mean each and every person who signs this Agreement, including all Borrowers named above. The words "we," "us," "our," and "Lender" mean Bank One, N.A.. You agree to the following terms and conditions:

Promise to Pay. You promise to pay Bank One, N.A., or order, the total of all credit advances and FINANCE CHARGES, and all costs and expenses for which you are responsible under this Agreement or under the "Mortgage" which secures your Credit Line. You will pay your Credit Line according to the payment terms set forth below. If there is more than one Borrower, each is jointly and severally liable on this Agreement. This means we can require any Borrower to pay all amounts due under this Agreement, including credit advances made to any Borrower. Each Borrower authorizes any other Borrower, on his or her signature alone, to cancel the Credit Line, to request and receive credit advances, and to do all other things necessary to carry out the terms of this Agreement. We can release any Borrower from responsibility under this Agreement, and the others will remain responsible.

Term. The term of your Credit Line will begin as of the date of this Agreement ("Opening Date") and will continue until March 16, 2015 ("Maturity Date"). All indebtedness under this Agreement, if not already paid pursuant to the payment provisions below, will be due and payable upon maturity. The draw period of your Credit Line will begin on a date, after the Opening Date, when the Agreement is accepted by us in the State of Ohio, following the expiration of the right to cancel, the perfection of the Mortgage, the receipt of all required certificates of noncancellation, and the meeting of all of our other conditions and will continue as follows: five (5) years. The Draw Period is also referred to as the "First Payment Stream". You may obtain credit advances during this period ("Draw Period"). After the Draw Period ends, the repayment period will begin and you will no longer be able to obtain credit advances. The length of the repayment period is as follows: ten (10) years. The Repayment Period is also referred to as the "Second Payment Stream". You agree that we may renew or extend the period during which you may obtain credit advances or make payments. You further agree that we may renew or extend your Credit Line Account.

Minimum Payment. During the Draw Period, your Regular Payment will be based on the Percentage shown below for the Outstanding Balance of your Credit Line, or $100.00, or the FINANCE CHARGE accrued for the billing cycle for which the statement is rendered, whichever is greater. Your payments will be due Monthly. In any event, if your Credit Line balance falls below $100.00, you agree to pay your balance in full.

| Range of Balances | Number of Payments | Regular Payment Calculation |
|---|---|---|
| All Balances | 60 | 1.000 % of your outstanding balance |

During the Repayment Period, your Regular Payment will be based on an Amortization of your Balance at Start of Repayment Period. Your payments will be due Monthly. Your Regular Payment for the Repayment Period is calculated by us at or near the end of the Draw Period. On the day we calculate your Regular Payment, we apply the ANNUAL PERCENTAGE RATE in effect on that day to the balance on your Credit Line and determine what amount is necessary to repay your balance at the ANNUAL PERCENTAGE RATE over the Amortization Period shown below.

| Range of Balances | Number of Payments | Amortization Period |
|---|---|---|
| All Balances | 120 | 120 payments |

During the Draw and Repayment Period, a change in the ANNUAL PERCENTAGE RATE can cause the balance to be repaid more quickly or more slowly. When rates decrease, less interest is due, so more of the payment repays the principal balance. When rates increase, more interest is due, so less of the payment repays the principal balance. If the ANNUAL PERCENTAGE RATE varies during the Repayment Period, however, the number of your payments may be increased or decreased to reflect the change in the ANNUAL PERCENTAGE RATE. You agree to continue making payments until the entire outstanding balance is paid in full.

Your "Minimum Payment" will be the Regular Payment, plus any amounts past due and all other charges. In addition, we have the right to require you to pay fees and charges assessed on the Credit Line Account with and in addition to the Minimum Payment. You agree to pay not less than the Minimum Payment on or before the due date indicated on your periodic billing statement.

Under some circumstances, the Repayment Period installment will not cover the Finance Charges and "negative amortization" will occur. Negative amortization will increase the amount you owe us and reduce your equity in your property.

How Your Payments Are Applied. Unless otherwise agreed or required by applicable law, payments and other credits will be applied to Finance Charges first; then to unpaid principal; then late charges and other charges.

Receipt of Payments. All payments must be made by a check, money order, or other instrument in U.S. dollars and must be received by us at the remittance address shown on your periodic billing statement. Payments received at that address on any business day will be credited your Credit Line as of the date received.

Credit Limit. This Agreement covers a revolving line of credit for the principal amount of Forty Eight Thousand Eight Hundred Seventy & __ Dollars ($48,870.00), which will be your "Credit Limit" under this Agreement. During the Draw Period we will honor your request for advances subject to the section below on Lender's Rights. You may borrow against the Credit Line, repay any portion of the amount __, and re-borrow up to the amount of the Credit Limit. Your Credit Limit is the maximum amount you may have outstanding at any one time. You agree not to attempt, request, or obtain a credit advance that will make your Credit Line Account balance exceed your Credit Limit. Your Credit Limit will not be increased should you overdraw your Credit Line Account. If you exceed your Credit Limit, you agree to repay immediately the amount by which your Credit Line Account exceeds your Credit Limit, even if we have not yet billed you. Any credit advances in excess of __ Credit Limit will not be secured by the Mortgage covering your principal dwelling.

Charges to your Credit Line. We may charge your Credit Line to pay other fees and costs that you are obligated to pay under this __ the Mortgage or any other document related to your Credit Line. In addition, we may charge your Credit Line for funds required for __ insurance coverage as described in the paragraph titled "Insurance" below or as described in the Mortgage for this transaction. We may also, our option, charge your Credit Line to pay any costs or expenses to protect or perfect our security interest in your principal dwelling __ costs or expenses include, without limitation, payments to cure defaults under any existing liens on your principal dwelling. If you do not __ your property taxes, we may charge your Credit Line and pay the delinquent taxes. Any amount so charged to your Credit Line will be a __ advance and will decrease the funds available, if any, under the Credit Line. However, we have no obligation to provide any of the __ advances referred to in this paragraph.

Credit Advances. After the Effective Disbursement Date of this Agreement, you may obtain credit advances under your Credit Line as follows:

   Credit Line Checks. Writing a preprinted "credit line check" that we will supply to you.

   Requests in Person. Requesting a credit advance in person at any of our authorized locations.

   Credit Card Access. Using your "credit card" to receive cash advances or to make purchases.

If there is more than one person authorized to use this Credit Line Account, you agree not to give us conflicting instructions, such as one of __ telling us not to give advances to the other.

Limitations on the Use of Checks. We reserve the right not to honor credit line checks in the following circumstances: __

## BANK ONE HOME EQUITY LINE OF CREDIT AGREEMENT AND DISCLOSURE STATEMENT

(Continued)

Page 2

**Post-dated Checks.** Your credit line check is post-dated. If a post-dated credit line check is paid and as a result any other check is returned or not paid, we are not responsible.

**Stolen Checks.** Your credit line checks have been reported lost or stolen.

**Unauthorized Signatures.** Your credit line check is not signed by an "Authorized Signer" as defined below.

**Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the credit line check.

If we pay any credit line check under these conditions, you must repay us, subject to applicable laws, for the amount of the credit line check. The credit line check itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of a check is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. We may choose not to return credit line checks along with your periodic billing statements; however, your use of each credit line check will be reflected on your periodic statement as a credit advance. We do not "certify" credit line checks drawn on your Credit Line.

**Limitations on the Use of Credit Cards.** We reserve the right to not honor credit cards in the following circumstances:

**Credit Limit Violation.** Your Credit Limit has been or would be exceeded by paying the credit card charge.

**Stolen Credit Cards.** Your credit cards have been reported lost or stolen.

**Unauthorized Signatures.** Your credit card is not used by an "Authorized Signer" as defined below.

**Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the Credit Line charge.

If we pay any advance requested by use of the credit card under these conditions, you must repay us, subject to applicable laws, for the amount of the advance. The advance itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of an advance is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. Your use of the credit card will be reflected on your periodic statement as a credit advance.

**Transaction Requirements.** The following transaction limitations will apply to the use of your Credit Line:

**Credit Line credit line check, In Person Request and Credit Card Limitations.** There are no transaction limitations for the writing of credit line checks, requesting an advance in person or using a Credit Card.

**Authorized Signers.** The words "Authorized Signer" on credit line checks and credit cards as used in this Agreement mean and include each person who (a) signs the application for this Credit Line, (b) signs this Agreement, or (c) has executed a separate signature authorization card for the Credit Line Account.

**Lost credit line checks and credit cards.** If you lose your credit line checks or credit cards or if someone is using them without your permission, you agree to let us know immediately. The fastest way to notify us is by calling us at (800) 800-5626.

**Liability For Unauthorized Use.** You may be liable for the unauthorized use of your credit card access device which accesses your Credit Line. You will not be liable for unauthorized use that occurs after you notify Lender or Lender's designee at Bank One, P.O. Box 29582, Phoenix, AZ 85038, orally or in writing, of the loss, theft, or possible unauthorized use. In any case, your liability for unauthorized use of your credit card will not exceed $50.00.

If you use an access card which debits a checking account (or other consumer asset account) but also draws on an overdraft line of credit, Regulation E provisions apply, as well as sections 226.13(d) and (g) of Regulation Z. In such a transaction, you might be liable for up to $50.00 under Regulation Z and in addition for $50.00, $500.00, or an unlimited amount under Regulation E. Please refer to your electronic fund transfers disclosure for liability limitations and error-resolution procedures for transactions covered by the federal Electronic Fund Transfers Act.

**Future Credit Line Services.** Your application for this Credit Line also serves as a request to receive any new services (such as access devices) which may be available at some future time as one of our services in connection with this Credit Line. You understand that this request is voluntary and that you may refuse any of these new services at the time they are offered. You further understand that the terms and conditions of this Agreement will govern any transactions made pursuant to any of these new services.

**Collateral.** You acknowledge this Agreement is secured by a Mortgage dated March 15, 2000, to us on real property located in COOK County, State of Illinois, all the terms and conditions of which are hereby incorporated and made a part of this Agreement.

**Insurance.** You must obtain insurance on the Property securing this Agreement that is reasonably satisfactory to us. You may obtain property insurance through any company of your choice that is reasonably satisfactory to us. You have the option of providing any insurance required under this Agreement through an existing policy or a policy independently obtained and paid for by you, subject to our right, for reasonable cause before credit is extended, to decline any insurance provided by you. Subject to applicable law, if you fail to obtain or maintain insurance as required in the Mortgage, we may purchase insurance to protect our own interest, add the premium to your balance, pursue any other remedies available to us, or do any one or more of these things.

**Periodic Statements.** If you have a balance owing on your Credit Line Account or have any account activity, we will send you a periodic statement. It will show, among other things, credit advances, FINANCE CHARGES, other charges, payments made, other credits, your "Previous Balance," and your "New Balance." Your statement also will identify the Minimum Payment you must make for that billing period and the date it is due.

**When FINANCE CHARGES Begin to Accrue.** Periodic FINANCE CHARGES for credit advances under your Credit Line will begin to accrue on the date credit advances are posted to your Credit Line. There is no "free ride period" which would allow you to avoid a FINANCE CHARGE on your Credit Line credit advances.

**Method Used to Determine the Balance on Which the FINANCE CHARGE Will Be Computed.** A daily FINANCE CHARGE will be imposed on credit advances made under your Credit Line imposed from the date of each credit advance based on the "daily balance" method. To get the daily balance, we take the beginning balance of your Credit Line Account each day, add any new advances and subtract any payments or credits, and any unpaid FINANCE CHARGES. This gives us the "daily balance."

**Method of Determining the Amount of FINANCE CHARGE.** Any FINANCE CHARGE is determined by applying the "Periodic Rate" to the balance described herein. Then we add together the periodic FINANCE CHARGES for each day in the billing cycle. This is your FINANCE CHARGE calculated by applying a Periodic Rate.

**Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE.** We will determine the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE as follows. We start with an independent index which is the Prime Rate. Prime Rate means the base rate on corporate loans posted by at least 75% of the USA's largest banks known as the Wall Street Journal Prime Rate and published in the Wall Street Journal (or alternate publication if required) on the 25th day of each month for the preceding business day. If the 25th is not a business day, then the Prime Rate will be the highest rate called "the Prime Rate" (the "Index"). We will use the most recent index value available to us as of the date of any ANNUAL PERCENTAGE RATE adjustment. The Index is not necessarily the lowest charged by us on our loans. If the Index becomes unavailable during the term of this Plan, we may designate a substitute index after notice to you. To determine the Periodic Rate that will apply to your First Payment Stream, we add a margin to the value of the Index, then divide that value by the number of days in a year (daily). To obtain the ANNUAL PERCENTAGE RATE we multiply the Periodic Rate by the number of days in a year (daily). This result is the ANNUAL PERCENTAGE RATE for your First Payment Stream. To determine the Periodic Rate that will apply to your Second Payment Stream, we add a margin to the value of the Index, then divide the value by the number of days in a year (daily) to obtain the ANNUAL PERCENTAGE RATE we multiply the Periodic Rate by the number of days in a year (daily). This result is the ANNUAL PERCENTAGE RATE for your Second Payment Stream. The ANNUAL PERCENTAGE RATE includes only interest and no other costs.

The Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE on your Credit Line will increase or decrease as the index increases decreases from time to time. Any increase in the Periodic Rate during the Second Payment Stream will take the form of more payments of the same amount. Adjustments to the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE resulting from changes in the Index take effect on the first day of the following billing cycle and will be in effect for the entire billing cycle. In no event will the corresponding ANNUAL PERCENTAGE RATE be more than the greater of 25.00000% or the maximum rate we would be allowed to charge or collect (federal law or the law of the State of Ohio as applicable). Today the Index is 8.750% per annum, and therefore the initial Periodic Rate and corresponding ANNUAL PERCENTAGE RATE on your Credit Line are as stated below.

## BANK ONE HOME EQUITY LINE OF CREDIT AGREEMENT AND DISCLOSURE STATEMENT
### (Continued)

Page 3

#### Current Rates for the First Payment Stream

| Range of Balance or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| All Balances | 2.500 % | 11.250 % | 0.03082 % |

#### Current Rates for the Second Payment Stream

| Range of Balance or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| All Balances | 2.500 % | 11.250 % | 0.03082 % |

Notwithstanding any other provision of this Agreement, we will not charge interest on any undisbursed loan proceeds, except as may be permitted during any Right of Rescission period. No matter what else may be stated in any other provision of this Agreement or in any other document you may have with us, you do not agree or intend to pay, and we do not agree or intend to charge any interest or fee for the BANK ONE HOME EQUITY LINE OF CREDIT AGREEMENT AND DISCLOSURE STATEMENT which would in any way cause us to contract for, charge or collect more for the Credit Line Account than the maximum which would be permitted to charge or collect by any applicable federal or Ohio state law. Any such excess interest or unauthorized fee will be applied first to reduce the unpaid principal balance of the Credit Line Account, and when the principal has been paid in full, be refunded to you.

**Conversion Option.** This Agreement contains an option to convert the interest rate from a variable rate with interest rate limits to a fixed rate as calculated below. The following information is representative of conversion features recently offered by us.

**ANNUAL PERCENTAGE RATE Increase.** Your ANNUAL PERCENTAGE RATE may increase if you exercise this option to convert to a fixed rate.

**Conversion Periods.** You can exercise the option to convert to a fixed rate only during the following period or periods: At any time during the Draw Period, with our written consent, any one of you may convert the repayment schedule for either the entire outstanding balance on the Credit Line Account or any portion thereof (but not less than $1,000.00) for a term not to exceed ten (10) years and at a fixed rate, dependent upon the term chosen by you (a "Lock"). You may have up to five (5) Locks outstanding at any one time but may not make additional advances to any one Lock once established. The total outstanding balance on any Lock will not be subject to the "Credit Advances" and "Minimum Payment" section of this Agreement. Instead, when each Lock is established, we will determine the payment amount that would be required to pay off the balance in that Lock in substantially equal payments over the term of the Lock at the fixed rate applicable to that Lock. Therefore, your Minimum Payment due each month will be the sum of the fixed payment amount for each Lock plus the minimum payment amount for the balance of your Account which has not been designated as a Lock (the "Credit Line"), calculated using the formula set forth in the "Minimum Payment" section of this agreement. Additional payments in any Lock may be made at any time but shall not affect your obligation to pay succeeding lock payments as long as any amount is still owing on the Lock. Any payment made upon your outstanding principal balance in any Lock will be available on the Credit Line for you to draw against upon posting of such payment prior to the maturity date.

**Conversion Fees.** You will be required to pay the following fees at the time of conversion to a fixed rate: We may charge you $50.00 for each Lock that we set up at your request.

**Rate Determination.** The fixed rate will be determined as follows: We shall establish the fixed rate and term when each Lock is opened by you based upon the term and rate available for a comparable Home Equity Loan offered by us at the time based upon a like loan to value ratio or upon a rate and term otherwise agreed to. A complete disclosure of the terms of the Lock shall be provided to you at the time the Lock is established which shall apply whether or not you have signed and returned the Lock Disclosure.

**Negative Amortization.** Under some circumstances, your payments will not cover the finance charges that accrue and negative amortization will occur. Negative amortization will increase the amount that you owe us and reduce your equity in your home.

**Conditions Under Which Other Charges May Be Imposed.** You agree to pay all the other fees and charges related to your Credit Line as set [...] below:

**Annual Fee.** A nonrefundable Annual Fee of $50.00 will be charged to your Credit Line at the following time: Annually during the [...] Period.

**Returned Items.** You may be charged $25.00 if you pay your Credit Line obligations with a check, draft, or other item that is [...] for any reason, unless applicable law requires a lower charge or prohibits any charge.

**Overlimit Charge.** Your Credit Line Account may be charged $25.00 if you cause your Credit Line Account to go over your Credit Limit. This includes writing a credit line check in excess of your available balance.

**Late Charges.** Your payment will be late if it is not received by us within 10 days of the "Payment Due Date" shown on your [...] statement. If your payment is late we may charge you $25.00.

**Other Charges.** Your Credit Line Account may be charged the following other charges:

**Fee to Close Account.** Your Credit Line Account may be charged Two Hundred Fifty and no/100 Dollars ($250.00) if you close or terminate your Credit Line Account within three (3) years of the Loan Date shown above. You will not be charged this fee if Lender suspends or terminates your Credit Line Account. You may prepay your Credit Line Account as noted in the Prepayment section of this Agreement without paying this fee as long as you do not close your account.

**Account Return Check Charge.** We may charge you a fee for the return of a check because you are delinquent or in default in any respect concerning the Credit Line Account. The amount of this other charge is : $25.00.

**Lender's Rights.** Under this Agreement, we have the following rights:

**Termination and Acceleration.** We can terminate your Credit Line Account and require you to pay us the entire outstanding balance [...] payment, and charge you certain fees, if any of the following happen:

(1) You commit fraud or make a material misrepresentation at any time in connection with this Credit Agreement. This can include, for example, a false statement about your income, assets, liabilities, or any other aspects of your financial condition.

(2) You do not meet the repayment terms of this Credit Agreement.

(3) Your action or inaction adversely affects the collateral for the plan or our rights in the collateral. This can include, for example, to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the [...] transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without our permission, foreclosure by the holder of [...] lien, or the use of funds or the dwelling for prohibited purposes.

**Suspension or Reduction.** In addition to any other rights we may have, we can suspend additional extensions of credit or reduce [...] Credit Limit during any period in which any of the following are in effect:

(1) The value of your property declines significantly below the property's appraised value for purposes of this Credit Line Account: includes, for example, a decline such that the initial difference between the Credit Limit and the available equity is reduced by fifty [...] and may include a smaller decline depending on the individual circumstances.

(2) We reasonably believe that you will be unable to fulfill your payment obligations under your Credit Line Account due to a change in your financial circumstances.

(3) You are in default under any material obligations of this Credit Line Account. We consider all of your obligations to be [...] Categories of material obligations include the events described above under Termination and Acceleration, obligations to pay fees, charges, obligations and limitations on the receipt of credit advances, obligations concerning maintenance or use of the property proceeds, obligations to pay and perform the terms of any other deed of trust, mortgage or lease of the property, obligations to notify and to provide documents or information to us (such as updated financial information), obligations to comply with applicable laws [...] zoning restrictions), and obligations of any cosigner. No default will occur until we mail or deliver a notice of default to you, so you [...]

## BANK ONE HOME EQUITY LINE OF CREDIT AGREEMENT AND DISCLOSURE STATEMENT

**(Continued)**

Page 4

restore your right to credit advances.

(4) We are precluded by government action from imposing the ANNUAL PERCENTAGE RATE provided for under this Agreement.

(5) The priority of our security interest is adversely affected by government action to the extent that the value of the security interest is less than one hundred twenty percent (120%) of the Credit Limit.

(6) We have been notified by governmental authority that continued advances may constitute an unsafe and unsound business practice.

**Change in Terms.** We may make changes to the terms of this Agreement if you agree to the change in writing at that time, if the change will unequivocally benefit you throughout the remainder of your Credit Line Account, or if the change is insignificant (such as changes relating to our data processing systems). If the Index is no longer available, we will choose a new Index and margin. The new Index will have an historical movement substantially similar to the original Index, and the new Index and margin will result in an ANNUAL PERCENTAGE RATE that is substantially similar to the rate in effect at the time the original index becomes unavailable. We may prohibit additional extensions of credit or reduce your Credit Limit during any period in which the maximum ANNUAL PERCENTAGE RATE under your Credit Line Account is reached.

**Access Devices.** If your Credit Line is suspended or terminated, you must immediately return to us all credit line checks and any other access devices. Any use of credit line checks or other access devices following suspension or termination may be considered fraudulent. You will also remain liable for any further use of credit line checks or other Credit Line access devices not returned to us.

**Delay in Enforcement.** We may delay or waive the enforcement of any of our rights under this Agreement without losing that right or any other right. If we delay or waive any of our rights, we may enforce that right at any time in the future without advance notice. For example, not terminating your account for non payment will not be a waiver of our right to terminate your account in the future if you have not paid.

**Cancellation by you.** If you cancel your right to credit advances under this Agreement, you must notify us and return all credit line checks and any other access devices to us. Despite cancellation, your obligation under this Agreement will remain in full force and effect until you have paid us all amounts due under this Agreement.

**Prepayment.** You may prepay all or any amount owing under this Credit Line at any time without penalty, except we will be entitled to receive all accrued FINANCE CHARGES, and other charges, if any. Payments in excess of your Minimum Payment will not relieve you of your obligation to continue to make your Minimum Payments. Instead, they will reduce the principal balance owed on the Credit Line. You agree not to send us payments marked "paid in full", "without recourse", or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Bank One, P.O. Box 29582 Phoenix, AZ 85038.

**Notices.** All notices will be sent to your address as shown in this Agreement. Notices will be mailed to you at a different address if you give us written notice of a different address. You agree to advise us promptly if you change your mailing address.

**Credit Information and Related Matters.** You authorize us to release information to others (such as credit bureaus, merchants, and other financial institutions) about the status and history of your Credit Line Account. You agree that, upon our request, you will provide us with a current financial statement, a new credit application, or both, on forms provided by us. You also agree we may obtain credit reports on you at any time, at our sole option and expense, for any reason, including but not limited to determining whether there has been an adverse change in your financial condition. We may require a new appraisal of the Property which secures your Credit Line at any time, including an internal inspection, at our sole option and expense.

**Transfer or Assignment.** Without prior notice or approval from you, we reserve the right to sell or transfer your Credit Line Account and our rights and obligations under this Agreement to another lender, entity, or person, and to assign our rights under the Mortgage. Your rights under this Agreement belong to you only and may not be transferred or assigned. Your obligations, however, are binding on your heirs and legal representatives. Upon any such sale or transfer, we will have no further obligation to provide you with credit advances or to perform any other obligation under this Agreement.

**Tax Consequences.** You understand that neither we, nor any of our employees or agents, make any representation or warranty whatsoever concerning the tax consequences of your establishing and using your Credit Line, including the deductibility of interest, and that neither we nor our employees or agents will be liable in the event interest on your Credit Line is not deductible. You should consult your own tax advisor for guidance on this subject.

**Periodic Review.** We will conduct a periodic review of your Bank One Credit Line Account, based on credit and financial information we may obtain or receive from you from time to time.

**Collection Costs.** If you are in default under the terms of this Agreement, we may take all lawful action under applicable law to collect the money you owe us. It is our intent to collect only those attorney's fees and those expenses, court and collection costs permitted by the laws of your state and the United States (including the bankruptcy laws of the United States). You agree to pay only those collection costs, attorney's fees that we actually incur and that we may lawfully collect from you. If the laws of your state will not let us collect all or some these collection costs and attorney's fees from you, we will not do so. To the extent the laws of your state prohibit us from contracting you to collect such fees or costs or prohibit us from including this provision in your agreement with us, this provision is severed from Agreement, is of no force and effect and your contract will be read and interpreted without this provision except to the extent federal law now or hereafter preempt the law of your state.

**CREDIT CARD ACCESS.** Notwithstanding anything contained in this Agreement to the contrary, credit card access may not be available in state. If credit card access is permitted in your state and becomes available, we will so advise you and will issue a credit card to you upon request. Any credit card issued in connection with the Bank One Home Equity Line of Credit account is NOT a debit card.

**FOREIGN TRANSACTIONS.** Bank One will charge, and Borrower will pay, in U.S. dollars for all foreign transactions at the exchange rate effect at the time the transaction is entered to Borrower's Bank One Credit Line Account, including any special currency exchange charges.

**Charges To Your Credit Line.** If you have elected to purchase credit life insurance, we may charge your Credit Line each month for credit insurance premiums as they become due. Each month the insurance charge that will be added to the principal balance on your Account will calculated by multiplying the average daily balance by the premium option you have selected. The premium will be included as a purchase and will be added to the principal balance upon which we will earn interest at the rate set forth herein. We have the right to the premium rate by giving you notice of this action thirty (30) days prior to the effective date. The new rate will apply only to the charges insurance made after the date of the rate change.

**IDENTITY OF LENDER.** Lender is Bank One, N.A., a national banking association with its main offices located in Columbus, Ohio.

**IMPORTANT INFORMATION SHARING NOTICE.** Lender shares information regarding transactions and experience about you and your account with other BANK ONE CORPORATION ("BANK ONE") companies. We may also other information such as employment and credit history, information on your applications, information other BANK ONE relationships and any other information among BANK ONE companies to offer products services that may be of interest to you. For example, "Banc One Mortgage Corporation, Banc One Corporation, First USA Bank and First National Bank of Chicago are some of the many Bank One companies provide a wide variety of financial services. You have the right to prohibit sharing this information to the permitted by the Fair Credit Reporting Act ("FCRA"). If you would like to exercise this right, please write to us BANK ONE, FCRA Opt-out, P.O. Box 182793, Columbus, Ohio 43218-2793, and include your name, security number, account number, telephone number, and sign and date your correspondence. If your account is joint account, each joint account owner that desires to opt out must provide the above information including signature. You may receive additional notices of your right to opt out, but you only need to respond once exercise this right.

**NOTIFY US OF ANY INACCURATE INFORMATION.** Please notify us if we report any inaccurate information about your account(s) to reporting agency. Your written notice describing the specific inaccuracy(ies) should be sent to us at: Banc One, P.O. Box 29582, Phoenix, 85038.

**Governing Law.** This agreement will be governed by and interpreted in accordance with federal law and the laws of the State of Illinois, for matters related to interest and the exportation of interest, which matters will be governed by and interpreted in accordance with federal including, but not limited to, statutes, regulations, interpretations, and opinions) and laws of the State of Ohio. However, if there ever question about whether any provision of the agreement is valid or enforceable, the provision that is questioned will be governed by state or federal law would find the provision to be valid and enforceable. The loan transaction which is evidenced by this and other documents has been approved, made and funded, and all necessary documents have been accepted by the Lender in the State of Ohio.

BANK ONE HOME EQUITY LINE OF CREDIT AGREEMENT AND
DISCLOSURE STATEMENT
(Continued)

Page 5

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Interpretation.** You agree that this Agreement, together with the Mortgage, is the best evidence of your agreements with us. If we go to court for any reason, we can use a copy, filmed or electronic, of any periodic statement, this Agreement, the Mortgage or any other document to prove what you owe us or that a transaction has taken place. The copy, microfilm, microfiche, or optical image will have the same validity as the original. You agree that, except to the extent you can show there is a billing error, your most current periodic statement is the best evidence of your obligation to pay.

**Severability.** If a court finds that any provision of this Agreement is not valid or should not be enforced, that fact by itself will not mean that the rest of this Agreement will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Agreement even if a provision of this Agreement may be found to be invalid or unenforceable.

**Acknowledgment.** You understand and agree to the terms and conditions in this Agreement. By signing this Agreement, you acknowledge that you have read this Agreement. You also acknowledge receipt of a completed copy of this Agreement, including the Fair Credit Billing Notice and the early home equity line of credit application disclosure, in addition to the handbook entitled "When Your Home Is On the Line: What You Should Know About Home Equity Lines of Credit," given with the application.

BORROWER:

X _____
EZZAT KHALIL, Individually

Effective Disbursement Date: The first business day after March 18, 2000.

BANK ONE HOME EQUITY LINE OF CREDIT AGREEMENT AND
**DISCLOSURE STATEMENT**
(Continued)

## BILLING ERROR RIGHTS

### YOUR BILLING RIGHTS

### KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify us in case of errors or questions about your bill.**

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at:

Bank One
P.O. Box 29582
Phoenix, AZ 85038

or at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

Your name and account number.

The dollar amount of the suspected error.

Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three (3) business days before the automatic payment is scheduled to occur.

**Your rights and our responsibilities after we receive your written notice.**

We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Credit Limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date on which it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

### Special Rule for Credit Card Purchases

If you have a problem with the quality of property or services that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or services. There are limitations on this right:

(a) You must have made the purchase in your home state or, if not within your home state within 100 miles of your current address, and

(b) The purchase price must have been more than $50.00.

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement of the property or services.

00222237
2364/0099 98 001 Page 1 of  14
2000-03-30 14:40:51
Cook County Recorder         45.50

00222237

WHEN RECORDED MAIL TO:
   Recorded Documents
   Bank One, N.A. Retail Loan
   Servicing KY2-1606
   P.O. Box 11606
   Lexington, KY 40576-1606

0041451106g046                           **FOR RECORDER'S USE ONLY**

This Mortgage prepared by:

   WILLIAM C MELCHER, PROCESSOR
   P.O. Box 2071
   Milwaukee, WI 53201-2071

## MORTGAGE

**MAXIMUM LIEN.** At no time shall the principal amount of Indebtedness secured by the Mortgage, not including sums advanced to protect the security of the Mortgage, exceed $48,870.00.

THIS MORTGAGE dated March 15, 2000, is made and executed between EZZAT KHALIL, whose address is 9511 MASSASOIT, OAK LAWN, IL 60453 and NADYA KHALIL, whose address is 9511 MASSASOIT, OAK LAWN, IL 60453; HUSBAND AND WIFE (referred to below as "Grantor") and Bank One, N.A., whose address is 100 East Broad Street, Columbus, OH 43271 (referred to below as "Lender").

**GRANT OF MORTGAGE.** For valuable consideration, Grantor mortgages, warrants, and conveys to Lender all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in COOK County, State of Illinois:

   TAX ID: 24-08-204-014

   The North half of Lot 6 in Block 3 in Frederick H. Bartlett's Central Wood, being a Subdivision in the East half of section 8, Township 37 North, Range 13, East of the Third Principal Meridian, in Cook County, Illinois.

The Real Property or its address is commonly known as 9511 MASSASOIT AVENUE, OAK LAWN, IL 60453. The Real Property tax identification number is 24-08-204-014.

**REVOLVING LINE OF CREDIT.** Specifically, in addition to the amounts specified in the Indebtedness definition, and without limitation, this Mortgage secures a revolving line of credit and shall secure not only the amount which Lender has presently advanced to Grantor under the Credit Agreement, but also any future amounts which Lender may advance to Grantor under the Credit Agreement within twenty (20) years from the date of

Exhibit 2

**MORTGAGE**
(Continued)

00222237

this Mortgage to the same extent as if such future advance were made as of the date of the execution of this Mortgage. The revolving line of credit obligates Lender to make advances to Grantor so long as Grantor complies with all the terms of the Credit Agreement and Related Documents. Such advances may be made, repaid, and remade from time to time, subject to the limitation that the total outstanding balance owing at any one time, not including finance charges on such balance at a fixed or variable rate or sum as provided in the Credit Agreement, any temporary overages, other charges, and any amounts expended or advanced as provided in either the Indebtedness paragraph or this paragraph, shall not exceed the Credit Limit as provided in the Credit Agreement. It is the intention of Grantor and Lender that this Mortgage secures the balance outstanding under the Credit Agreement from time to time from zero up to the Credit Limit as provided in this Mortgage and any intermediate balance.

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF EACH OF GRANTOR'S AGREEMENTS AND OBLIGATIONS UNDER THE CREDIT AGREEMENT, THE RELATED DOCUMENTS, AND THIS MORTGAGE. THIS MORTGAGE IS INTENDED TO AND SHALL BE VALID AND HAVE PRIORITY OVER ALL SUBSEQUENT LIENS AND ENCUMBRANCES, INCLUDING STAUTORY LIENS, EXCEPTING SOLELY TAXES AND ASSESSMENTS LEVIED ON THE REAL PROPERTY, TO THE EXTENT OF THE MAXIMUM AMOUNT SECURED HEREBY. THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

**GRANTOR'S WAIVERS.** Grantor waives all rights or defenses arising by reason of any "one action" or "anti-deficiency" law, or any other law which may prevent Lender from bringing any action against Grantor, including a claim for deficiency to the extent Lender is otherwise entitled to a claim for deficiency, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES.** Grantor warrants that: (a) this Mortgage is executed at Borrower's request and not at the request of Lender; (b) Grantor has the full power, right, and authority to enter into this Mortgage and to hypothecate the Property; (c) the provisions of this Mortgage do not conflict with, or result in a default under any agreement or other instrument binding upon Grantor and do not result in a violation of any law, regulation, court decree or order applicable to Grantor; (d) Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and (e) Lender has made no representation to Grantor about Borrower (including without limitation the creditworthiness of Borrower).

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Mortgage, Borrower shall pay to Lender all Indebtedness secured by this Mortgage as it becomes due, and Borrower and Grantor shall strictly perform all Borrower's and Grantor's obligations under this Mortgage.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Borrower and Grantor agree that Borrower's and Grantor's possession and use of the Property shall be governed by the following provisions:

**Possession and Use.** Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

**Duty to Maintain.** Grantor shall maintain the Property in good condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Compliance With Environmental Laws.** Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of

**MORTGAGE**
(Continued)

00222237    Page 3

any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Mortgage, including the obligation to indemnify, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon nor leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Mortgage:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished

**MORTGAGE**
(Continued)

00222237    Page 4

to the Property. Grantor shall maintain the Property free of all liens having priority over or equal to the interest of Lender under this Mortgage, except for the lien of taxes and assessments not due, except for the Existing Indebtedness referred to below, and except as otherwise provided in the following paragraph.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and permissible fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage:

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of ten (10) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Mortgage. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Mortgage, then to pay accrued interest, and the remainder, if any, shall be

**MORTGAGE**
(Continued)

00222237    Page 5

---

applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Unexpired Insurance at Sale.** Any unexpired insurance shall inure to the benefit of, and pass to, the purchaser of the Property covered by this Mortgage at any trustee's sale or other sale held under the provisions of this Mortgage, or at any foreclosure sale of such Property.

**Compliance with Existing Indebtedness.** During the period in which any Existing Indebtedness described below is in effect, compliance with the insurance provisions contained in the instrument evidencing such Existing Indebtedness shall constitute compliance with the insurance provisions under this Mortgage, to the extent compliance with the terms of this Mortgage would constitute a duplication of insurance requirement. If any proceeds from the insurance become payable on loss, the provisions in this Mortgage for division of proceeds shall apply only to that portion of the proceeds not payable to the holder of the Existing Indebtedness.

**LENDER'S EXPENDITURES.** If Grantor fails (A) to keep the Property free of all taxes, liens, security interests, encumbrances, and other claims (B) to provide any required insurance on the Property, (C) to make repairs to the Property or to comply with any obligation to maintain Existing Indebtedness in good standing as required below, then Lender maydo so. If any action or proceeding is commenced that would materially affect Lender's interests in the Property, then Lender on Grantor's behalf may, but is not required to, take any action that Lender believes to be appropriate to protect Lender's interests. All expenses incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Credit Agreement from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Credit Agreement and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Credit Agreement; or (C) be treated as a balloon payment which will be due and payable at the Credit Agreement's maturity. The Property also will secure payment of these amounts. The rights provided for in this paragraph shall be in addition to any other rights or any remedies to which Lender may be entitled on account of any default. Any such action by Lender shall not be construed as curing the default so as to bar Lender from any remedy that it otherwise would have had.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage:

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in the Existing Indebtedness section below or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Mortgage, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Promises.** All promises, agreements, and statements Grantor has made in this Mortgage shall survive the execution and delivery of this Mortgage, shall be continuing in nature and shall remain in full force and effect until such time as Borrower's Indebtedness is paid in full.

**EXISTING INDEBTEDNESS.** The following provisions concerning Existing Indebtedness are a part of this Mortgage:

**MORGAGE**
(Continued)

00222237   Page 6

**Existing Lien.** The lien of this Mortgage securing the Indebtedness may be secondary and inferior to the lien securing payment of an existing obligation. The existing obligation has a current principal balance of approximately $111121. Grantor expressly covenants and agrees to pay, or see to the payment of, the Existing Indebtedness and to prevent any default on such indebtedness, any default under the instruments evidencing such indebtedness, or any default under any security documents for such indebtedness.

**No Modification.** Grantor shall not enter into any agreement with the holder of any mortgage, deed of trust, or other security agreement which has priority over this Mortgage by which that agreement is modified, amended, extended, or renewed without the prior written consent of Lender. Grantor shall neither request nor accept any future advances under any such security agreement without the prior written consent of Lender.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Mortgage:

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Mortgage.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Mortgage or upon all or any part of the Indebtedness secured by this Mortgage; (2) a specific tax on Borrower which Borrower is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (3) a tax on this type of Mortgage chargeable against the Lender or the holder of the Credit Agreement; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Borrower.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Mortgage, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Mortgage as a security agreement are a part of this Mortgage:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures or other personal property, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall execute financing statements and take whatever other action is requested by Lender to perfect and continue Lender's security interest in the Personal

**MORTGAGE**
(Continued)

00222237

Property. In addition to recording this Mortgage in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Mortgage as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall assemble the Personal Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Mortgage may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Mortgage.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Mortgage:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Borrower's and Grantor's obligations under the Credit Agreement, this Mortgage, and the Related Documents, and (2) the liens and security interests created by this Mortgage on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-in-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Borrower pays all the Indebtedness when due, terminates the credit line account, and otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**REINSTATEMENT OF SECURITY INTEREST.** If payment is made by Borrower, whether voluntarily or otherwise, or by guarantor or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment (A) to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, (B) by reason of any judgment, decree or order of any court or administrative body having jurisdiction over Lender or any of Lender's property, or (C) by reason of any settlement or compromise of any claim made by Lender with any claimant (including without limitation Borrower), the Indebtedness shall be considered unpaid for the purpose of enforcement of this Mortgage and this Mortgage shall continue to be effective or shall be reinstated, as the case may be, notwithstanding any cancellation of this Mortgage or of any note or other instrument or agreement evidencing the Indebtedness and the Property will continue to secure the amount repaid or recovered to the same extent as if that amount never had been originally received by Lender, and Grantor shall be bound by any judgment, decree, order, settlement or compromise relating to the Indebtedness or to this Mortgage.

**EVENTS OF DEFAULT.** Grantor will be in default under this Mortgage if any of the following happen:

(1) Grantor commits fraud or makes a material misrepresentation at any time in connection with the Credit Agreement. This can include, for example, a false statement about Borrower's or Grantor's income, assets, liabilities, or any other aspects of Borrower's or Grantor's financial condition.

**MORTGAGE**
(Continued)

00222237

(2) Borrower does not meet the repayment terms of the Credit Agreement.

(3) Grantor's action or inaction adversely affects the collateral or Lender's rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without our permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default and at any time thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option without notice to Grantor to declare the entire Indebtedness immediately due and payable, including any prepayment penalty which Grantor would be required to pay.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** Lender shall have the right, without notice to Borrower or Grantor, to take possession of the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney-in-fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Mortgagee in Possession.** Lender shall have the right to be placed as mortgagee in possession or to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The mortgagee in possession or receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure.** Lender may obtain a judicial decree foreclosing Grantor's interest in all or any part of the Property.

**Deficiency Judgment.** If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Credit Agreement or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Borrower and Grantor hereby waives any and all right to have the property marshalled. In exercising its rights and remedies, Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender will give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition.

**Election of Remedies.** An election by Lender to choose any one remedy will not bar Lender from using any

**MORTGAGE**
(Continued)

00222237

other remedy. If Lender decides to spend money or to perform any of Grantor's obligations under this Mortgage, after Grantor's failure to do so, that decision by Lender will not affect Lender's right to declare Grantor in default and to exercise Lender's remedies.

**NOTICES.** Any notice required to be given under this Mortgage, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Mortgage. All copies of notices of foreclosure from the holder of any lien which has priority over this Mortgage shall be sent to Lender's address, as shown near the beginning of this Mortgage. Any person may change his or her address for notices under this Mortgage by giving formal written notice to the other person or persons, specifying that the purpose of the notice is to change the person's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors. It will be Grantor's responsibility to tell the others of the notice from Lender. Notwithstanding the foregoing, the address for notice for Lender is: Bank One, P.O. Box 29582, Phoenix, AZ 85038.

**IDENTITY OF LENDER.** Lender is Bank One, N.A., a national banking association with its main offices located in Columbus, Ohio.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** What is written in this Mortgage and in the Related Documents is Grantor's entire agreement with Lender concerning the matters covered by this Mortgage. To be effective, any change or amendment to this Mortgage must be in writing and must be signed by whoever will be bound or obligated by the change or amendment.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Governing Law.** This agreement will be governed by and interpreted in accordance with federal law and the laws of the State of Illinois, except for matters related to interest and the exportation of interest, which matters will be governed by and interpreted in accordance with federal law (including, but not limited to, statutes, regulations, interpretations, and opinions) and laws of the State of Ohio. However, if there ever is a question about whether any provision of the agreement is valid or enforceable, the provision that is questioned will be governed by whichever state or federal law would find the provision to be valid and enforceable. The loan transaction which is evidenced by this and other related documents has been approved, made and funded, and all necessary documents have been accepted by Lender in the State of Ohio.

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Mortgage shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Borrower and Grantor signing below is responsible for all obligations in this Mortgage.

**No Waiver by Lender.** Grantor understands Lender will not give up any of Lender's rights under this Mortgage unless Lender does so in writing. The fact that Lender delays or omits to exercise any right will not mean that Lender has given up that right. If Lender does agree in writing to give up one of Lender's rights, that does not mean Grantor will not have to comply with the other provisions of this Mortgage. Grantor also understands that if Lender does consent to a request, that does not mean that Grantor will not have to get Lender's consent again if the situation happens again. Grantor further understands that just because Lender consents to one or more of Grantor's requests, that does not mean Lender will be required to consent to any of Grantor's future requests. Grantor waives presentment, demand for payment, protest, and notice of dishonor.

**Severability.** If a court finds that any provision of this Mortgage is not valid or should not be enforced, that

**MORTGAGE**
(Continued)

00222237   Page 10

fact by itself will not mean that the rest of this Mortgage will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Mortgage even if a provision of this Mortgage may be found to be invalid or unenforceable.

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Mortgage on transfer of Grantor's interest, this Mortgage shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Mortgage and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Mortgage or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Mortgage.

**Waiver of Homestead Exemption.** Grantor hereby releases and waives all rights and benefits of the homestead exemption laws of the State of Illinois as to all Indebtedness secured by this Mortgage.

**DEFINITIONS.** The following words shall have the following meanings when used in this Mortgage:

**Borrower.** The word "Borrower" means EZZAT KHALIL, and all other persons and entities signing the Credit Agreement.

**Credit Agreement.** The words "Credit Agreement" mean the credit agreement dated March 15, 2000, in **the original principal amount of $48,870.00** from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. The interest rate on the Credit Agreement is a variable interest rate based upon an index. The index currently is 8.750% per annum. Payments on the Credit Agreement are to be made in accordance with the following payment schedule: in one payment of all outstanding principal plus all accrued unpaid interest on March 15, 2015. In addition, Borrower will pay regular   payments of all accrued unpaid interest due as of each payment date, beginning , with all subsequent interest payments to be due on the same day of each  after that. If the index increases, the payments tied to the index, and therefore the total amount secured hereunder, will increase. Any variable interest rate tied to the index shall be calculated as of, and shall begin on, the commencement date indicated for the applicable payment stream. Notwithstanding the foregoing, the variable interest rate or rates provided for in this Mortgage shall be subject to the following maximum rate. NOTICE: Under no circumstances shall the interest rate on this Mortgage be more than the lesser of 25.000% per annum or the maximum rate allowed by applicable law. The maturity date of this Mortgage is March 15, 2015.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the Events of Default set forth in this Mortgage in the Events of Default section of this Mortgage.

**Existing Indebtedness.** The words "Existing Indebtedness" mean the indebtedness described in the Existing Liens provision of this Mortgage.

**Grantor.** The word "Grantor" means EZZAT KHALIL and NADYA KHALIL.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or

**MORTGAGE**
(Continued)

00222237

potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Credit Agreement or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Credit Agreement or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage, together with interest on such amounts as provided in this Mortgage. **In addition, and without limitation, the term "Indebtedness" includes all amounts identified in the Revolving Line of Credit paragraph of this Mortgage. However, the term "Indebtedness" is subject to the limitations identified in the Maximum Lien paragraph of this Mortgage.**

**Lender.** The word "Lender" means Bank One, N.A., its successors and assigns. The words "successors or assigns" mean any person or company that acquires any interest in the Credit Agreement.

**Mortgage.** The word "Mortgage" means this Mortgage between Grantor and Lender.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Mortgage.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

**MORTGAGE**
(Continued)

00222237

EACH GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MORTGAGE, AND EACH GRANTOR AGREES TO ITS TERMS.

GRANTOR:

X _____
**EZZAT KHALIL, Individually**

X _____
**NADYA KHALIL, Individually**

---

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF ILLINOIS          )
                           ) SS
COUNTY OF COOK             )

> OFFICIAL SEAL
> Mahdi N. Salem
> Notary Public, State of Illinois
> My Commission Expires

On this day before me, the undersigned Notary Public, personally appeared **EZZAT KHALIL**, to me known to be the individual described in and who executed the Mortgage, and acknowledged that he or she signed the Mortgage as his or her free and voluntary act and deed, for the uses and purposes therein mentioned.

Given under my hand and official seal this _____15_____ day of ___MARCH_____ , 20 _00_ .

By _____         Residing at __Orland Park, IL_____
    Mahdi N Salem
Notary Public in and for the State of ___IL_____

My commission expires ___3-19-03_____

00222237

```
2012478+1                    00414511069046
KHALIL, EZZAT
DEED OF TRUST / MORTGAGE
```

## MORTGAGE
(Continued)

00222237

### INDIVIDUAL ACKNOWLEDGMENT

| | | |
|---|---|---|
| **STATE OF ILLINOIS** | ) | |
| | ) SS | |
| **COUNTY OF COOK** | ) | |

*[Notary stamp: OFFICIAL SEAL / Mahdi N. Salem / Notary Public, State of Illinois / My Commission Expires...]*

On this day before me, the undersigned Notary Public, personally appeared **NADYA KHALIL**, to me known to be the individual described in and who executed the Mortgage, and acknowledged that he or she signed the Mortgage as his or her free and voluntary act and deed, for the uses and purposes therein mentioned.

Given under my hand and official seal this _____15 th_____ day of ___March_____, 20 _OO_.

By _____   Residing at __Orland Park, IL__

Mahdi N Salem   IL

Notary Public In and for the State of ___IL___

My commission expires ___3-19-03___

# FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUL 1 5 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COUR[

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 03 CR 386 |
| | ) | |
| EZZAT KHALIL, | ) | Violations: Title 21, United |
| OSAMA ALDAWASMEH, | ) | States Code, Sections 843(b), |
| KAIRDIN ALNOUBANI, | ) | 846, and 963, Title 18, United |
| NASER DAR EGHRAYYEB, | ) | States Code, Sections |
| IZALDEEN TAHA, | ) | 1956(a)(1)(B)(i) and 2 |
| GEORGES YOUSSEF, | ) | |
| GALEB MIZYED, | ) | |
| SALEH MIZYED, | ) | |
| TARIQ HAMMAD, and | ) | |
| KIMBERLY EASTERLING | ) | |
| | ) | |

**DOCKETED**

**JUL 1 6 2003**

JUDGE DARRAH

## COUNT ONE

The SPECIAL FEBRUARY 2002-1 GRAND JURY charges:

### Introduction

1.    At times material to this indictment pseudoephedrine was a List I chemical under Title 21, United States Code, Sections 802(33) and 802(34)(K). Pseudoephedrine was generally used as an over-the-counter sinus medication, but it also could be used as a precursor chemical in the manufacture of methamphetamine or a substance containing a detectable amount of methamphetamine, a Schedule III Controlled Substance, under Title 21, United States Code, Section 812.

### Conspiracy

2.    Beginning in or about December 2000, until on or about



GOVERNMENT
EXHIBIT
B

61

April 15, 2003, at Chicago, in the Northern District of Illinois,
Eastern Division, and elsewhere,

EZZAT KHALIL,
OSAMA ALDAWASMEH,
KAIRDIN ALNOUBANI,
NASER DAR EGHRAYYEB,
IZALDEEN TAHA,
GEORGES YOUSSEF,
GALEB MIZYED,
SALEH MIZYED,
TARIQ HAMMAD, and
KIMBERLY EASTERLING,

defendants herein conspired and agreed with each other and with
others known and unknown to the Grand Jury knowingly and
intentionally to import into the United States from a place outside
the United States, namely Canada, pseudoephedrine, a List I
chemical, knowing and having reasonable cause to believe that the
pseudoephedrine would be used to manufacture a controlled
substance, namely, mixtures containing a detectable amount of
methamphetamine, a Schedule III Controlled Substance, in violation
of Title 21, United States Code, Section 960(d)(3);

3.    It was part of the conspiracy that defendants, along with
others known and unknown to the Grand Jury, illegally imported and
distributed, and caused to be imported and distributed,
pseudoephedrine, knowing and having reasonable cause to believe
that the pseudoephedrine would be used to manufacture a substance
containing a detectable amount of methamphetamine.

4.    It was further part of the conspiracy that defendants
EZZAT KHALIL, OSAMA ALDAWASMEH, KAIRDIN ALNOUBANI, NASER DAR

2

EGHRAYYEB, IZALDEEN TAHA, GALEB MIZYED, SALEH MIZYED, TARIQ HAMMAD, and others (collectively the "Investor Defendants") pooled cash to purchase millions of tablets of pseudoephedrine in Canada.

5.  It was further part of the conspiracy that the cash raised by the Investor Defendants was given to pseudoephedrine brokers in Canada, including GEORGES YOUSSEF, in exchange for bulk quantities of pseudoephedrine.

6.  It was further part of the conspiracy that the Investor Defendants smuggled, attempted to smuggle, and caused to be smuggled the bulk shipments of pseudoephedrine into the United States from Canada.  One way the Investor Defendants arranged to smuggle the bulk quantities of pseudoephedrine was to conceal the pseudoephedrine in truckloads of bottled water (the "water shipments") that were shipped from Canada to Mississippi.

7.  It was further part of the conspiracy that KIMBERLY EASTERLING established a "front" company, called Austin Distribution Company ("Austin Distribution"), in Poplarville, Mississippi.  EASTERLING and the Investor Defendants arranged to have bulk quantities of pseudoephedrine concealed in cover loads sent from Canada to Austin Distribution's facilities in Mississippi.  There, EASTERLING and the Investor Defendants separated and caused to be separated the bulk quantities of pseudoephedrine from the cover loads of water, and sent and caused to be sent the pseudoephedrine to Las Vegas, Nevada.

3

8.   It was further part of the conspiracy that the Investor Defendants and KIMBERLY EASTERLING stored the pseudoephedrine in warehouses in Las Vegas. From there, the Investor Defendants and KIMBERLY EASTERLING arranged to sell the pseudoephedrine to individuals who would and did take the pseudoephedrine to California and elsewhere for the eventual manufacture of methamphetamine.

9.   It was further part of the conspiracy that the Investor Defendants and KIMBERLY EASTERLING arranged for the proceeds of the pseudoephedrine sales to be sent from Las Vegas, Nevada, to Chicago, Illinois.

10.   It was further part of the conspiracy that defendants misrepresented, concealed, and hid, and caused to be misrepresented, concealed and hidden, the purposes of and the acts done in furtherance of the conspiracy and used cellular telephones, coded language, and other means to avoid detection by law enforcement authorities and otherwise to provide security to the members of the conspiracy;

All in violation of Title 21, United States Code, Section 963 and Title 18, United States Code, Section 2.

4

## COUNT TWO

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

1.    Paragraphs 1 and 3 through 10 of Count One of this indictment are realleged and incorporated here.

2.    Beginning in or about December 2000, until at least on or about April 15, 2003, at Chicago, in the Northern District of Illinois, Eastern Division; and elsewhere,

> EZZAT KHALIL,
> OSAMA ALDAWASMEH,
> KAIRDIN ALNOUBANI,
> NASER DAR EGHRAYYEB,
> IZALDEEN TAHA,
> GEORGES YOUSSEF,
> GALEB MIZYED,
> SALEH MIZYED,
> TARIQ HAMMAD, and
> KIMBERLY EASTERLING,

defendants herein conspired and agreed with each other and with others known and unknown to the Grand Jury knowingly and intentionally to possess and distribute a listed chemical, namely, pseudoephedrine, a List I chemical, knowing and having reasonable cause to believe that the listed chemical would be used to manufacture a controlled substance, namely, mixtures containing a detectable amount of methamphetamine, a Schedule III Controlled Substance, in violation of Title 21, United States Code, Section 841(c)(2);

All in violation of Title 21, United States Code, Section 846 and Title 18, United States Code, Section 2.

5

<u>COUNT THREE</u>

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about August 13, 2002, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, as described in Call 2983 on Target Phone III,

IZALDEEN TAHA
and NASER DAR EGHRAYYEB,

defendants herein, knowingly and intentionally used and caused to be used a communication facility, namely a telephone, in committing and causing and facilitating the commission of a felony violation of Title 21, United States Code, Section 963, namely, conspiracy to import into the United States from a place outside the United States, namely Canada, pseudoephedrine, a List I chemical, knowing and having reasonable cause to believe that the listed chemical would be used to manufacture a controlled substance, namely, mixtures containing a detectable amount of methamphetamine, a Schedule III Controlled Substance, as charged in Count One;

In violation of Title 21, United States Code, Section 843(b).

6

COUNT FOUR

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about August 13, 2002, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, as described in Call 2990 on Target Phone III,

IZALDEEN TAHA
and OSAMA ALDAWASMEH,

defendants herein, knowingly and intentionally used and caused to be used a communication facility, namely a telephone, in committing and causing and facilitating the commission of a felony violation of Title 21, United States Code, Section 963, namely, conspiracy to import into the United States from a place outside the United States, namely Canada, pseudoephedrine, a List I chemical, knowing and having reasonable cause to believe that the listed chemical would be used to manufacture a controlled substance, namely, mixtures containing a detectable amount of methamphetamine, a Schedule III Controlled Substance, as charged in Count One;

In violation of Title 21, United States Code, Section 843(b).

7

## COUNT FIVE

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about August 14, 2002, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, as described in Call 154 on Target Phone IV,

EZZAT KHALIL
and KAIRDIN ALNOUBANI,

defendants herein, knowingly and intentionally used and caused to be used a communication facility, namely a telephone, in committing and causing and facilitating the commission of a felony violation of Title 21, United States Code, Section 963, namely, conspiracy to import into the United States from a place outside the United States, namely Canada, pseudoephedrine, a List I chemical, knowing and having reasonable cause to believe that the listed chemical would be used to manufacture a controlled substance, namely, mixtures containing a detectable amount of methamphetamine, a Schedule III Controlled Substance, as charged in Count One;

In violation of Title 21, United States Code, Section 843(b).

8

## COUNT SIX

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about August 15, 2002, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, as described in Call 3111 on Target Phone III,

OSAMA ALDAWASMEH
and GEORGES YOUSSEF,

defendants herein, knowingly and intentionally used and caused to be used a communication facility, namely a telephone, in committing and causing and facilitating the commission of a felony violation of Title 21, United States Code, Section 963, namely, conspiracy to import into the United States from a place outside the United States, namely Canada, pseudoephedrine, a List I chemical, knowing and having reasonable cause to believe that the listed chemical would be used to manufacture a controlled substance, namely, mixtures containing a detectable amount of methamphetamine, a Schedule III Controlled Substance, as charged in Count One;

In violation of Title 21, United States Code, Section 843(b).

9

COUNT SEVEN

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about August 16, 2002, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, as described in Call 325 on Target Phone IV,

EZZAT KHALIL
and KAIRDIN ALNOUBANI,

defendants herein, knowingly and intentionally used and caused to be used a communication facility, namely a telephone, in committing and causing and facilitating the commission of a felony violation of Title 21, United States Code, Section 963, namely, conspiracy to import into the United States from a place outside the United States, namely Canada, pseudoephedrine, a List I chemical, knowing and having reasonable cause to believe that the listed chemical would be used to manufacture a controlled substance, namely, mixtures containing a detectable amount of methamphetamine, a Schedule III Controlled Substance, as charged in Count One;

In violation of Title 21, United States Code, Section 843(b).

10

## COUNT EIGHT

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about June 5, 2002, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, as described in Call 146 on Target Phone I,

OSAMA ALDAWASMEH
and TARIQ HAMMAD,

defendants herein, knowingly and intentionally used and caused to be used a communication facility, namely a telephone, in committing and causing and facilitating the commission of a felony violation of Title 21, United States Code, Section 963, namely, conspiracy to import into the United States from a place outside the United States, namely Canada, pseudoephedrine, a List I chemical, knowing and having reasonable cause to believe that the listed chemical would be used to manufacture a controlled substance, namely, mixtures containing a detectable amount of methamphetamine, a Schedule III Controlled Substance, as charged in Count One;

In violation of Title 21, United States Code, Section 843(b).

11

## COUNT NINE

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about June 5, 2002, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, as described in Call 147 on Target Phone I,

OSAMA ALDAWASMEH
and TARIQ HAMMAD,

defendants herein, knowingly and intentionally used and caused to be used a communication facility, namely a telephone, in committing and causing and facilitating the commission of a felony violation of Title 21, United States Code, Section 963, namely, conspiracy to import into the United States from a place outside the United States, namely Canada, pseudoephedrine, a List I chemical, knowing and having reasonable cause to believe that the listed chemical would be used to manufacture a controlled substance, namely, mixtures containing a detectable amount of methamphetamine, a Schedule III Controlled Substance, as charged in Count One;

In violation of Title 21, United States Code, Section 843(b).

12

## COUNT TEN

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about June 5, 2002, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, as described in Call 143 on Target Phone I,

OSAMA ALDWASMEH
and NASER DAR EGHRAYYEB,

defendants herein, knowingly and intentionally used and caused to be used a communication facility, namely a telephone, in committing and causing and facilitating the commission of a felony violation of Title 21, United States Code, Section 963, namely, conspiracy to import into the United States from a place outside the United States, namely Canada, pseudoephedrine, a List I chemical, knowing and having reasonable cause to believe that the listed chemical would be used to manufacture a controlled substance, namely, mixtures containing a detectable amount of methamphetamine, a Schedule III Controlled Substance, as charged in Count One;

In violation of Title 21, United States Code, Section 843(b).

13

## COUNT ELEVEN

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about August 13, 2002, at Oak Lawn, in the Northern District of Illinois, Eastern Division, and elsewhere, as described in Call 96 on Target Phone IV,

EZZAT KHALIL
and SALEH MIZYED,

defendants herein, knowingly and intentionally used and caused to be used a communication facility, namely a telephone, in committing and causing and facilitating the commission of a felony violation of Title 21, United States Code, Section 963, namely, conspiracy to import into the United States from a place outside the United States, namely Canada, pseudoephedrine, a List I chemical, knowing and having reasonable cause to believe that the listed chemical would be used to manufacture a controlled substance, namely, mixtures containing a detectable amount of methamphetamine, a Schedule III Controlled Substance, as charged in Count One;

In violation of Title 21, United States Code, Section 843(b).

14

## COUNT TWELVE

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about August 13, 2002, at Oak Lawn, in the Northern District of Illinois, Eastern Division, and elsewhere, as described in Call 101 on Target Phone IV,

### EZZAT KHALIL
### and SALEH MIZYED,

defendants herein, knowingly and intentionally used and caused to be used a communication facility, namely a telephone, in committing and causing and facilitating the commission of a felony violation of Title 21, United States Code, Section 963, namely, conspiracy to import into the United States from a place outside the United States, namely Canada, pseudoephedrine, a List I chemical, knowing and having reasonable cause to believe that the listed chemical would be used to manufacture a controlled substance, namely, mixtures containing a detectable amount of methamphetamine, a Schedule III Controlled Substance, as charged in Count One;

In violation of Title 21, United States Code, Section 843(b).

15

## COUNT THIRTEEN

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about November 10, 2002, at Bolingbrook and elsewhere in the Northern District of Illinois, Eastern Division,

### OSAMA ALDAWASMEH,

defendant herein, knowingly conducted and attempted to conduct a financial transaction affecting interstate commerce, when, in connection with the purchase of real property at 835 Briarcliff Road, Bolingbrook, Illinois, he caused to be issued a TCF National Bank Illinois Official Check, number 527036573, dated November 10, 2002, in the amount of $2,000, which financial transaction involved the proceeds of a specified unlawful activity, namely, violations of the Controlled Substances Act, as described in Counts One and Two of this Indictment, and knowing that the transaction was designed, in whole and in part, to conceal and disguise the nature, source, ownership, and control of the proceeds of said specified unlawful activity and further knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity;

In violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

16

## COUNT FOURTEEN

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about January 29, 2003, at Bolingbrook and elsewhere in the Northern District of Illinois, Eastern Division,

### OSAMA ALDAWASMEH,

defendant herein, knowingly conducted and attempted to conduct a financial transaction affecting interstate commerce, when, in connection with the purchase of real property at 835 Briarcliff Road, Bolingbrook, Illinois, he caused to be issued a personal check, number 7174, drawn on a TCF National Bank account, dated January 29, 2003, in the amount of $9,700, which financial transaction involved the proceeds of a specified unlawful activity, namely, violations of the Controlled Substances Act, as described in Counts One and Two of this Indictment, and knowing that the transaction was designed, in whole and in part, to conceal and disguise the nature, source, ownership, and control of the proceeds of said specified unlawful activity and further knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity;

In violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

17

## COUNT FIFTEEN

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

In or about February 2003, at Oak Lawn and elsewhere in the Northern District of Illinois, Eastern Division,

### KAIRDIN ALNOUBANI,

defendant herein, knowingly conducted and attempted to conduct a financial transaction, affecting interstate commerce, with the payment of approximately $28,000 in United States currency in connection with the purchase of a 1999 BMW Model740i sedan (VIN: WBAGG8332XDN74386) from Individual A, which transaction involved the proceeds of specified unlawful activity, namely violations of the Controlled Substances Act as described in Counts One and Two of this Indictment, knowing that the transaction was designed, in whole and in part, to conceal and disguise the nature, the source, the ownership, and the control of the proceeds of such specified unlawful activity and further knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity;

In violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

18

## COUNT SIXTEEN

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about May 13, 2002, at Tinley Park and elsewhere in the Northern District of Illinois, Eastern Division,

### KAIRDIN ALNOUBANI,

defendant herein, knowingly conducted and attempted to conduct a financial transaction affecting interstate commerce, when, in connection with the purchase of real property at 8731 Black Oak, in Tinley Park, Illinois, he caused the transfer of a monetary instrument in the amount of $81,974.10, which financial transaction involved the proceeds of specified unlawful activity, namely violations of the Controlled Substances Act as described in Counts One and Two of this Indictment, knowing that the transaction was designed, in whole and in part, to conceal and disguise the nature, source, ownership, and control of the proceeds of said specified unlawful activity and further knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity;

In violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

19

## COUNT SEVENTEEN

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about March 15, 2002, at Westchester and elsewhere in the Northern District of Illinois, Eastern Division,

### IZALDEEN TAHA,

defendant herein, knowingly conducted and attempted to conduct a financial transaction affecting interstate commerce, when, in connection with the purchase of real property at 16651 Dorchester Place, Lockport, Illinois, he caused the transfer of a monetary instrument in the amount of $39,743.47, which financial transaction involved the proceeds of specified unlawful activity, namely violations of the Controlled Substances Act as described in Counts One and Two of this Indictment, knowing that the transaction was designed, in whole and in part, to conceal and disguise the nature, source, ownership, and control of the proceeds of said specified unlawful activity and further knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity;

In violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

20

### FORFEITURE ALLEGATION ONE

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

1.    The allegations of Counts One through Twelve of this Indictment are realleged and incorporated herein by reference for the purpose of alleging that certain property is subject to forfeiture to the United States, pursuant to the provisions of Title 21, United States Code, Section 853.

2.    As a result of their violations of Title 21, United States Code, Sections 843, 846 and 963 as alleged in the foregoing Indictment,

> EZZAT KHALIL,
> OSAMA ALDAWASMEH,
> KAIRDIN ALNOUBANI,
> NASER DAR EGHRAYYEB,
> IZALDEEN TAHA,
> GEORGES YOUSSEF,
> GALEB MIZYED,
> SALEH MIZYED,
> TARIQ HAMMAD, and
> KIMBERLY EASTERLING,

defendants herein, shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853(a)(1) and (2): (1) any and all property constituting or derived from, any proceeds obtained, directly or indirectly, as a result of the violations; and (2) any and all of property used, or intended to be used, in any manner or part, to commit or facilitate the commission of the violations.

3.    The interests of the defendants, jointly and severally, subject to forfeiture to the United States pursuant to Title 21,

21

United States Code, Section 853, include, but are not limited to,
the following:

(a)   Real property located at 9511 Massasoit Ave, Oak
      Lawn, Illinois;

(b)   Real property located a ‾ ‾ Crest Drive,
      Darien, Illinois;

954 -232-

(c)   Real property located a
      Lockport, Illinois;

4512

(d)   Real property located
      Park, Illinois;

(e)   approximately $4,000,00·

4.   By virtue of the commission
Counts One through Twelve of this Indic
right, title or interest that any d·
described property is vested in the Unic‗‗ ‗‗‗   ‗
21, United States Code, Section 853.

5.   If any of the property described above as being subject
to forfeiture pursuant to Title 21, United States Code, Section
853(a), as a result of any act or omission of the defendants:

a.   cannot be located upon the exercise of due
     diligence;

b.   has been transferred to, sold to, or deposited with
     a third person;

c.   has been placed beyond the jurisdiction of the
     Court;

d.   has been substantially diminished in value;

e.   has been commingled with other property which
     cannot be subdivided without difficulty;

22

it is the intent of the United States to seek forfeiture of substitute property belonging to defendants under the provisions of Title 21, United States Code, Section 853(p).

All pursuant to Title 21, United States Code, Section 853.

## FORFEITURE ALLEGATION TWO

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

1.   The allegations of Counts Thirteen through Seventeen of this Indictment are realleged and incorporated by reference as if fully restated herein for the purpose of alleging that certain property is subject to forfeiture to the United States, pursuant to Title 18, United States Code, Section 982.

2.   As a result of their violations of Title 18, United States Code, Section 1956 and 2, as alleged in the foregoing Indictment,

OSAMA ALDAWASMEH,
KAIRDIN ALNOUBANI, and
IZALDEEN TAHA,

defendants herein, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all right, title, and interest they may have in any property, real and personal, involved in the money laundering offenses and traceable to the property involved in the offenses, which property is subject to forfeiture pursuant to Title 18, United States Code, Section 982.

3.   The interests of the defendant subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 982, include, but are not limited to, the following:

(a)   approximately $11,700;

24

(b)  a 1999 BMW Model740i sedan (VIN: BAGG8332XDN74386);

(c)  real property located at 16651 Dorchester Place, Lockport, Illinois; and

(d)  real property located at 8731 Black Oak, Tinley Park, Illinois.

4.   By virtue of the commission of the offenses charged in Counts Thirteen through Seventeen of this Indictment by the defendants, all right, title or interest that any defendant has in the above-described property is vested in the United States pursuant to Title 18, United States Code, Section 982.

5.   If any of the forfeitable property described above, as a result of any act or omission by the defendants:

a.   Cannot be located upon the exercise of due diligence;

b.   Has been transferred or sold to, or deposited with, a third party;

c.   Has been placed beyond the jurisdiction of the Court;

d.   Has been substantially diminished in value; or

e.   Has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the provisions of Title 21, United

25

States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

All pursuant to Title 18, United States Code, Section 982.

A TRUE BILL:

FOREPERSON

UNITED STATES ATTORNEY

26

No.  03 CR 386

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

UNITED STATES OF AMERICA

v.

KHALI KHALIL,
OSAMA ALDAMLESHI,
FAIROUZ ALMOUNABI,
MAHER DAR MOKHATTEB,
IBRAHIM TALL,
GEORGES YOUSSEF,
CALEB MITTED,
SALEH MITTED,
TARIQ KAMHAD, and
KIMBERLY KLEVERLING

**I N D I C T M E N T**

Violations: Title 21 United States Code,
Sections 843(b), 846, and 963, Title 18,
United States Code, Sections 1956(a)(1)(B)(i)
and 2

A true bill

Foreman

Filed in open court this ___ day of _____ 2013
A.D. 19

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE                         )

GRAND JURY INVESTIGATION    )
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)      No. 02 GJ 478
                              No. 03 GJ 478

Eugene "Gene" Moore   Fee: $26.50
Cook County Recorder of Deeds
Date: 04/17/2003 12:32 PM Pg: 1 of 2

## LIS PENDENS NOTICE

TO ALL WHOM IT MAY CONCERN:

NOTICE IS HEREBY GIVEN that on April 17, 2003, an order was entered in the United

States District Court for the Northern District of Illinois by Chief Judge Charles P. Kocoras,

affecting title to real property and directing the filing of a lis pendens notice.

The purpose of this order is to preserve the availability of certain real property for forfeiture

to the United States, pursuant to the provisions of Title 21, United States Code, Section 853(e). The

real property is commonly known as 9511 Massasoit Avenue, Oak Lawn, Illinois, legally described

as:

THE NORTH ½ OF LOT 6 IN BLOCK 3 IN FREDERICK H. BARTLETT'S


GOVERNMENT
EXHIBIT
C

CENTRAL WOOD, BEING A SUBDIVISION IN THE EAST ½ OF
SECTION 8, TOWNSHIP 37 NORTH, RANGE 13 EAST OF THE THIRD
PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

PIN: 24-08-204-014-000

Further information concerning this action may be obtained from the undersigned Assistant

United States Attorney.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:    _____

AYLICE M. TOOHEY
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300

To be returned to:

United States Attorney's Office
Attn: Tanya Sluder
219 South Dearborn Street, 3rd Floor
Chicago, Illinois 60604

F I L E D

AUG 0 5 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DOCKETED

AUG 0 6 2003

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **JUDGE DARRAH** |
| | ) | |
| v. | ) | No. 03 CR 386 |
| | ) | |
| EZZAT KHALIL, | ) | Violations: Title 21, United |
| OSAMA ALDAWASMEH, | ) | States Code, Sections 843(b), |
| KAIRDIN ALNOUBANI, | ) | 846, and 963, Title 18, United |
| NASER DAR EGHRAYYEB, | ) | States Code, Sections |
| IZALDEEN TAHA, | ) | 1956(a)(1)(B)(i) and 2 |
| GEORGES YOUSSEF, | ) | |
| GALEB MIZYED, | ) | |
| SALEH MIZYED, | ) | **SUPERSEDING INDICTMENT** |
| TARIQ HAMMAD, and | ) | |
| KIMBERLY EASTERLING | ) | |
| | ) | |

MAGISTRATE JUDGE SIDNEY I. SCHENKIER

COUNT ONE

The SPECIAL FEBRUARY 2002-1 GRAND JURY charges:

Introduction

1.    At times material to this indictment pseudoephedrine was
a List I chemical under Title 21, United States Code, Sections
802(33) and 802(34)(K). Pseudoephedrine was generally used as an
over-the-counter sinus medication, but it also could be used as a
precursor chemical in the manufacture of methamphetamine or a
substance containing a detectable amount of methamphetamine, a
Schedule III Controlled Substance, under Title 21, United States
Code, Section 812.

Conspiracy

2.    Beginning in or about December 2000, until on or about



GOVERNMENT
EXHIBIT
D

1

81

April 15, 2003, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

EZZAT KHALIL,
OSAMA ALDAWASMEH,
KAIRDIN ALNOUBANI,
NASER DAR EGHRAYYEB,
IZALDEEN TAHA,
GEORGES YOUSSEF,
GALEB MIZYED,
SALEH MIZYED,
TARIQ HAMMAD, and
KIMBERLY EASTERLING,

defendants herein conspired and agreed with each other and with others known and unknown to the Grand Jury knowingly and intentionally to import into the United States from a place outside the United States, namely Canada, pseudoephedrine, a List I chemical, knowing and having reasonable cause to believe that the pseudoephedrine would be used to manufacture a controlled substance, namely, mixtures containing a detectable amount of methamphetamine, a Schedule III Controlled Substance, in violation of Title 21, United States Code, Section 960(d)(3);

3. It was part of the conspiracy that defendants, along with others known and unknown to the Grand Jury, illegally imported and distributed, and caused to be imported and distributed, pseudoephedrine, knowing and having reasonable cause to believe that the pseudoephedrine would be used to manufacture a substance containing a detectable amount of methamphetamine.

4. It was further part of the conspiracy that defendants EZZAT KHALIL, OSAMA ALDAWASMEH, KAIRDIN ALNOUBANI, NASER DAR

2

EGHRAYYEB, IZALDEEN TAHA, GALEB MIZYED, SALEH MIZYED, TARIQ HAMMAD, and others (collectively the "Investor Defendants") pooled cash to purchase millions of tablets of pseudoephedrine in Canada.

5.    It was further part of the conspiracy that the cash raised by the Investor Defendants was given to pseudoephedrine brokers in Canada, including GEORGES YOUSSEF, in exchange for bulk quantities of pseudoephedrine.

6.    It was further part of the conspiracy that the Investor Defendants smuggled, attempted to smuggle, and caused to be smuggled the bulk shipments of pseudoephedrine into the United States from Canada. One way the Investor Defendants arranged to smuggle the bulk quantities of pseudoephedrine was to conceal the pseudoephedrine in truckloads of bottled water (the "water shipments") that were shipped from Canada to Mississippi.

7.    It was further part of the conspiracy that KIMBERLY EASTERLING established a "front" company, called Austin Distribution Company ("Austin Distribution"), in Poplarville, Mississippi. EASTERLING and the Investor Defendants arranged to have bulk quantities of pseudoephedrine concealed in cover loads sent from Canada to Austin Distribution's facilities in Mississippi. There, EASTERLING and the Investor Defendants separated and caused to be separated the bulk quantities of pseudoephedrine from the cover loads of water, and sent and caused to be sent the pseudoephedrine to Las Vegas, Nevada.

3

8. It was further part of the conspiracy that the Investor Defendants and KIMBERLY EASTERLING stored the pseudoephedrine in warehouses in Las Vegas. From there, the Investor Defendants and KIMBERLY EASTERLING arranged to sell the pseudoephedrine to individuals who would and did take the pseudoephedrine to California and elsewhere for the eventual manufacture of methamphetamine.

9. It was further part of the conspiracy that the Investor Defendants and KIMBERLY EASTERLING arranged for the proceeds of the pseudoephedrine sales to be sent from Las Vegas, Nevada, to Chicago, Illinois.

10. It was further part of the conspiracy that defendants misrepresented, concealed, and hid, and caused to be misrepresented, concealed and hidden, the purposes of and the acts done in furtherance of the conspiracy and used cellular telephones, coded language, and other means to avoid detection by law enforcement authorities and otherwise to provide security to the members of the conspiracy;

All in violation of Title 21, United States Code, Section 963 and Title 18, United States Code, Section 2.

4

## COUNT TWO

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

1.  Paragraphs 1 and 3 through 10 of Count One of this indictment are realleged and incorporated here.

2.  Beginning in or about December 2000, until at least on or about April 15, 2003, at Chicago, in the Northern District of Illinois, Eastern Division; and elsewhere,

EZZAT KHALIL,
OSAMA ALDAWASMEH,
KAIRDIN ALNOUBANI,
NASER DAR EGHRAYYEB,
IZALDEEN TAHA,
GEORGES YOUSSEF,
GALEB MIZYED,
SALEH MIZYED,
TARIQ HAMMAD, and
KIMBERLY EASTERLING,

defendants herein conspired and agreed with each other and with others known and unknown to the Grand Jury knowingly and intentionally to possess and distribute a listed chemical, namely, pseudoephedrine, a List I chemical, knowing and having reasonable cause to believe that the listed chemical would be used to manufacture a controlled substance, namely, mixtures containing a detectable amount of methamphetamine, a Schedule III Controlled Substance, in violation of Title 21, United States Code, Section 841(c)(2);

All in violation of Title 21, United States Code, Section 846 and Title 18, United States Code, Section 2.

5

## COUNT THREE

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about August 13, 2002, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, as described in Call 2983 on Target Phone III,

### IZALDEEN TAHA
### and NASER DAR EGHRAYYEB,

defendants herein, knowingly and intentionally used and caused to be used a communication facility, namely a telephone, in committing and causing and facilitating the commission of a felony violation of Title 21, United States Code, Section 963, namely, conspiracy to import into the United States from a place outside the United States, namely Canada, pseudoephedrine, a List I chemical, knowing and having reasonable cause to believe that the listed chemical would be used to manufacture a controlled substance, namely, mixtures containing a detectable amount of methamphetamine, a Schedule III Controlled Substance, as charged in Count One;

In violation of Title 21, United States Code, Section 843(b).

6

## COUNT FOUR

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about August 13, 2002, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, as described in Call 2990 on Target Phone III,

IZALDEEN TAHA
and OSAMA ALDAWASMEH,

defendants herein, knowingly and intentionally used and caused to be used a communication facility, namely a telephone, in committing and causing and facilitating the commission of a felony violation of Title 21, United States Code, Section 963, namely, conspiracy to import into the United States from a place outside the United States, namely Canada, pseudoephedrine, a List I chemical, knowing and having reasonable cause to believe that the listed chemical would be used to manufacture a controlled substance, namely, mixtures containing a detectable amount of methamphetamine, a Schedule III Controlled Substance, as charged in Count One;

In violation of Title 21, United States Code, Section 843(b).

7

<u>COUNT FIVE</u>

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about August 14, 2002, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, as described in Call 154 on Target Phone IV,

EZZAT KHALIL
and KAIRDIN ALNOUBANI,

defendants herein, knowingly and intentionally used and caused to be used a communication facility, namely a telephone, in committing and causing and facilitating the commission of a felony violation of Title 21, United States Code, Section 963, namely, conspiracy to import into the United States from a place outside the United States, namely Canada, pseudoephedrine, a List I chemical, knowing and having reasonable cause to believe that the listed chemical would be used to manufacture a controlled substance, namely, mixtures containing a detectable amount of methamphetamine, a Schedule III Controlled Substance, as charged in Count One;

In violation of Title 21, United States Code, Section 843(b).

8

## COUNT SIX

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about August 15, 2002, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, as described in Call 3111 on Target Phone III,

OSAMA ALDAWASMEH
and GEORGES YOUSSEF,

defendants herein, knowingly and intentionally used and caused to be used a communication facility, namely a telephone, in committing and causing and facilitating the commission of a felony violation of Title 21, United States Code, Section 963, namely, conspiracy to import into the United States from a place outside the United States, namely Canada, pseudoephedrine, a List I chemical, knowing and having reasonable cause to believe that the listed chemical would be used to manufacture a controlled substance, namely, mixtures containing a detectable amount of methamphetamine, a Schedule III Controlled Substance, as charged in Count One;

In violation of Title 21, United States Code, Section 843(b).

9

## COUNT SEVEN

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about August 16, 2002, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, as described in Call 325 on Target Phone IV,

EZZAT KHALIL
and KAIRDIN ALNOUBANI,

defendants herein, knowingly and intentionally used and caused to be used a communication facility, namely a telephone, in committing and causing and facilitating the commission of a felony violation of Title 21, United States Code, Section 963, namely, conspiracy to import into the United States from a place outside the United States, namely Canada, pseudoephedrine, a List I chemical, knowing and having reasonable cause to believe that the listed chemical would be used to manufacture a controlled substance, namely, mixtures containing a detectable amount of methamphetamine, a Schedule III Controlled Substance, as charged in Count One;

In violation of Title 21, United States Code, Section 843(b).

10

## COUNT EIGHT

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about June 5, 2002, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, as described in Call 146 on Target Phone I,

OSAMA ALDAWASMEH
and TARIQ HAMMAD,

defendants herein, knowingly and intentionally used and caused to be used a communication facility, namely a telephone, in committing and causing and facilitating the commission of a felony violation of Title 21, United States Code, Section 963, namely, conspiracy to import into the United States from a place outside the United States, namely Canada, pseudoephedrine, a List I chemical, knowing and having reasonable cause to believe that the listed chemical would be used to manufacture a controlled substance, namely, mixtures containing a detectable amount of methamphetamine, a Schedule III Controlled Substance, as charged in Count One;

In violation of Title 21, United States Code, Section 843(b).

11

## COUNT NINE

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about June 5, 2002, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, as described in Call 147 on Target Phone I,

OSAMA ALDAWASMEH
and TARIQ HAMMAD,

defendants herein, knowingly and intentionally used and caused to be used a communication facility, namely a telephone, in committing and causing and facilitating the commission of a felony violation of Title 21, United States Code, Section 963, namely, conspiracy to import into the United States from a place outside the United States, namely Canada, pseudoephedrine, a List I chemical, knowing and having reasonable cause to believe that the listed chemical would be used to manufacture a controlled substance, namely, mixtures containing a detectable amount of methamphetamine, a Schedule III Controlled Substance, as charged in Count One;

In violation of Title 21, United States Code, Section 843(b).

12

## COUNT TEN

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about June 5, 2002, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, as described in Call 143 on Target Phone I,

### OSAMA ALDWASMEH
### and NASER DAR EGHRAYYEB,

defendants herein, knowingly and intentionally used and caused to be used a communication facility, namely a telephone, in committing and causing and facilitating the commission of a felony violation of Title 21, United States Code, Section 963, namely, conspiracy to import into the United States from a place outside the United States, namely Canada, pseudoephedrine, a List I chemical, knowing and having reasonable cause to believe that the listed chemical would be used to manufacture a controlled substance, namely, mixtures containing a detectable amount of methamphetamine, a Schedule III Controlled Substance, as charged in Count One;

In violation of Title 21, United States Code, Section 843(b).

13

<u>COUNT ELEVEN</u>

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about August 13, 2002, at Oak Lawn, in the Northern District of Illinois, Eastern Division, and elsewhere, as described in Call 96 on Target Phone IV,

EZZAT KHALIL
and SALEH MIZYED,

defendants herein, knowingly and intentionally used and caused to be used a communication facility, namely a telephone, in committing and causing and facilitating the commission of a felony violation of Title 21, United States Code, Section 963, namely, conspiracy to import into the United States from a place outside the United States, namely Canada, pseudoephedrine, a List I chemical, knowing and having reasonable cause to believe that the listed chemical would be used to manufacture a controlled substance, namely, mixtures containing a detectable amount of methamphetamine, a Schedule III Controlled Substance, as charged in Count One;

In violation of Title 21, United States Code, Section 843(b).

14

## COUNT TWELVE

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about August 13, 2002, at Oak Lawn, in the Northern District of Illinois, Eastern Division, and elsewhere, as described in Call 101 on Target Phone IV,

EZZAT KHALIL
and SALEH MIZYED,

defendants herein, knowingly and intentionally used and caused to be used a communication facility, namely a telephone, in committing and causing and facilitating the commission of a felony violation of Title 21, United States Code, Section 963, namely, conspiracy to import into the United States from a place outside the United States, namely Canada, pseudoephedrine, a List I chemical, knowing and having reasonable cause to believe that the listed chemical would be used to manufacture a controlled substance, namely, mixtures containing a detectable amount of methamphetamine, a Schedule III Controlled Substance, as charged in Count One;

In violation of Title 21, United States Code, Section 843(b).

15

## COUNT THIRTEEN

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about November 10, 2002, at Bolingbrook and elsewhere in the Northern District of Illinois, Eastern Division,

### OSAMA ALDAWASMEH,

defendant herein, knowingly conducted and attempted to conduct a financial transaction affecting interstate commerce, when, in connection with the purchase of real property at 835 Briarcliff Road, Bolingbrook, Illinois, he caused to be issued a TCF National Bank Illinois Official Check, number 527036573, dated November 10, 2002, in the amount of $2,000, which financial transaction involved the proceeds of a specified unlawful activity, namely, violations of the Controlled Substances Act, as described in Counts One and Two of this Indictment, and knowing that the transaction was designed, in whole and in part, to conceal and disguise the nature, source, ownership, and control of the proceeds of said specified unlawful activity and further knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity;

In violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

16

## COUNT FOURTEEN

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about January 29, 2003, at Bolingbrook and elsewhere in the Northern District of Illinois, Eastern Division,

### OSAMA ALDAWASMEH,

defendant herein, knowingly conducted and attempted to conduct a financial transaction affecting interstate commerce, when, in connection with the purchase of real property at 835 Briarcliff Road, Bolingbrook, Illinois, he caused to be issued a personal check, number 7174, drawn on a TCF National Bank account, dated January 29, 2003, in the amount of $9,700, which financial transaction involved the proceeds of a specified unlawful activity, namely, violations of the Controlled Substances Act, as described in Counts One and Two of this Indictment, and knowing that the transaction was designed, in whole and in part, to conceal and disguise the nature, source, ownership, and control of the proceeds of said specified unlawful activity and further knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity;

In violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

17

## COUNT FIFTEEN

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

In or about February 2003, at Oak Lawn and elsewhere in the Northern District of Illinois, Eastern Division,

### KAIRDIN ALNOUBANI,

defendant herein, knowingly conducted and attempted to conduct a financial transaction, affecting interstate commerce, with the payment of approximately $28,000 in United States currency in connection with the purchase of a 1999 BMW Model740i sedan (VIN: WBAGG8332XDN74386) from Individual A, which transaction involved the proceeds of specified unlawful activity, namely violations of the Controlled Substances Act as described in Counts One and Two of this Indictment, knowing that the transaction was designed, in whole and in part, to conceal and disguise the nature, the source, the ownership, and the control of the proceeds of such specified unlawful activity and further knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity;

In violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

18

## COUNT SIXTEEN

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about May 13, 2002, at Tinley Park and elsewhere in the Northern District of Illinois, Eastern Division,

### KAIRDIN ALNOUBANI,

defendant herein, knowingly conducted and attempted to conduct a financial transaction affecting interstate commerce, when, in connection with the purchase of real property at 8731 Black Oak, in Tinley Park, Illinois, he caused the transfer of a monetary instrument in the amount of $81,974.10, which financial transaction involved the proceeds of specified unlawful activity, namely violations of the Controlled Substances Act as described in Counts One and Two of this Indictment, knowing that the transaction was designed, in whole and in part, to conceal and disguise the nature, source, ownership, and control of the proceeds of said specified unlawful activity and further knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity;

In violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

19

## COUNT SEVENTEEN

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

On or about March 15, 2002, at Westchester and elsewhere in the Northern District of Illinois, Eastern Division,

### IZALDEEN TAHA,

defendant herein, knowingly conducted and attempted to conduct a financial transaction affecting interstate commerce, when, in connection with the purchase of real property at 16651 Dorchester Place, Lockport, Illinois, he caused the transfer of a monetary instrument in the amount of $39,743.47, which financial transaction involved the proceeds of specified unlawful activity, namely violations of the Controlled Substances Act as described in Counts One and Two of this Indictment, knowing that the transaction was designed, in whole and in part, to conceal and disguise the nature, source, ownership, and control of the proceeds of said specified unlawful activity and further knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity;

In violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

20

## FORFEITURE ALLEGATION ONE

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

1.    The allegations of Counts One through Twelve of this Indictment are realleged and incorporated herein by reference for the purpose of alleging that certain property is subject to forfeiture to the United States, pursuant to the provisions of Title 21, United States Code, Section 853.

2.    As a result of their violations of Title 21, United States Code, Sections 843, 846 and 963 as alleged in the foregoing Indictment,

> EZZAT KHALIL,
> OSAMA ALDAWASMEH,
> KAIRDIN ALNOUBANI,
> NASER DAR EGHRAYYEB,
> IZALDEEN TAHA,
> GEORGES YOUSSEF,
> GALEB MIZYED,
> SALEH MIZYED,
> TARIQ HAMMAD, and
> KIMBERLY EASTERLING,

defendants herein, shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853(a)(1) and (2): (1) any and all property constituting or derived from, any proceeds obtained, directly or indirectly, as a result of the violations; and (2) any and all of property used, or intended to be used, in any manner or part, to commit or facilitate the commission of the violations.

3.    The interests of the defendants, jointly and severally, subject to forfeiture to the United States pursuant to Title 21,

21

United States Code, Section 853, include, but are not limited to, the following:

> (a)    Real property located at 9511 Massasoit Ave, Oak Lawn, Illinois;
>
> (b)    Real property located at 1037 Park Crest Drive, Darien, Illinois;
>
> (c)    Real property located at 16651 Dorchester Place, Lockport, Illinois;
>
> (d)    Real property located at 8731 Black Oak, Tinley Park, Illinois;
>
> (e)    approximately $4,000,000;
>
> (f)    assorted jewelry; and
>
> (g)    various vehicles.

4.    By virtue of the commission of the offenses charged in Counts One through Twelve of this Indictment by the defendants, all right, title or interest that any defendant has in the above-described property is vested in the United States pursuant to Title 21, United States Code, Section 853.

5.    If any of the property described above as being subject to forfeiture pursuant to Title 21, United States Code, Section 853(a), as a result of any act or omission of the defendants:

> a.    cannot be located upon the exercise of due diligence;
>
> b.    has been transferred to, sold to, or deposited with a third person;
>
> c.    has been placed beyond the jurisdiction of the Court;
>
> d.    has been substantially diminished in value;

22

    e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek forfeiture of substitute property belonging to defendants under the provisions of Title 21, United States Code, Section 853(p).

All pursuant to Title 21, United States Code, Section 853.

23

## FORFEITURE ALLEGATION TWO

The SPECIAL FEBRUARY 2002-1 GRAND JURY further charges:

1.    The allegations of Counts Thirteen through Seventeen of this Indictment are realleged and incorporated by reference as if fully restated herein for the purpose of alleging that certain property is subject to forfeiture to the United States, pursuant to Title 18, United States Code, Section 982.

2.    As a result of their violations of Title 18, United States Code, Section 1956 and 2, as alleged in the foregoing Indictment,

OSAMA ALDAWASMEH,
KAIRDIN ALNOUBANI, and
IZALDEEN TAHA,

defendants herein, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all right, title, and interest they may have in any property, real and personal, involved in the money laundering offenses and traceable to the property involved in the offenses, which property is subject to forfeiture pursuant to Title 18, United States Code, Section 982.

3.    The interests of the defendant subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 982, include, but are not limited to, the following:

(a)    approximately $11,700;

24

      (b)   a 1999 BMW Model740i sedan (VIN: BAGG8332XDN74386);

      (c)   real property located at 16651 Dorchester Place, Lockport, Illinois; and

      (d)   real property located at 8731 Black Oak, Tinley Park, Illinois.

4.    By virtue of the commission of the offenses charged in Counts Thirteen through Seventeen of this Indictment by the defendants, all right, title or interest that any defendant has in the above-described property is vested in the United States pursuant to Title 18, United States Code, Section 982.

5.    If any of the forfeitable property described above, as a result of any act or omission by the defendants:

      a.   Cannot be located upon the exercise of due diligence;

      b.   Has been transferred or sold to, or deposited with, a third party;

      c.   Has been placed beyond the jurisdiction of the Court;

      d.   Has been substantially diminished in value; or

      e.   Has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the provisions of Title 21, United

25

States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

All pursuant to Title 18, United States Code, Section 982.

A TRUE BILL:

_____
FOREPERSON

_____
UNITED STATES ATTORNEY

26

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 02 C 4641 | DATE | 9/12/2002 |
| CASE TITLE | BANK ONE, N.A. vs. ROCHELLE EVERLY | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Status hearing held. Enter Memorandum Opinion And Order. The second amended complaint to foreclose mortgage is dismissed with prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | number of notices | |
| | No notices required. | | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | SEP 13 2002 | |
| ✓ | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| | | date mailed notice | |
| LG | courtroom deputy's initials | | |
| | Date/time received in central Clerk's Office | mailing deputy initials | |

GOVERNMENT EXHIBIT E

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BANK ONE, N.A.,                          )
                                         )
            Plaintiff,                   )
                                         )      No. 02 C 4641
      v.                                 )
                                         )      Judge John W. Darrah
ROCHELLE EVERLY, MAURICE F. CODY,        )
PACIFIC COAST INVESTMENT CO., UNITED     )
STATES OF AMEREICA, et al.,              )
                                         )
            Defendants.                  )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Bank One, filed a Second Amended Complaint To Foreclose Mortgage ("Complaint") in the Circuit Court of Cook County against multiple defendants, including the United States of America ("United States"). The United States removed the Second Amended Complaint to this Court and filed the presently pending motion to dismiss. Bank One did not file a response to the motion to dismiss.

In reviewing a motion to dismiss, the court reviews all facts alleged in the complaint and any reasonable inferences drawn therefrom in the light most favorable to the plaintiff. *See Marshall-Mosby v. Corporate Receivables, Inc.*, 205 F.3d 323, 326 (7th Cir. 2000). Dismissal is only warranted if the plaintiff can prove no set of facts in support of its claims that would entitle it to relief. *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

Bank One filed a complaint to foreclose its mortgage against the real property commonly known as 6806 South Constance Avenue (the "Constance Property"). In May 2002, Bank One filed a Second Amended Complaint. Maurice F. Cody ("Cody") was made a party to terminate his unspecified interest in the Constance Property. Bank One joined the United States to terminate its interest, which the complaint describes as "United States of America, by virtue of a

*Lis Pendens* recorded 4/18/01 as Document No. 0010316853, U.S. against Maurice Cody, Case 01 CR 261."

As to the criminal case referred to in the Complaint, on March 20, 2001, the United States filed its indictment against Cody. Pursuant to 18 U.S.C. § 982 and as a result of violations of 18 U.S.C. §§ 1956 and 1957, the indictment sought forfeiture of the Constance Property.[1]

The United States moves to dismiss the Complaint, arguing that this Court lacks subject matter jurisdiction pursuant to 21 U.S.C. § 853(k)(2).

Section 853(k)(2) provides:

> Except as provided in subsection (n)[2], no party claiming an interest in property subject to forfeiture under this section may–
> (1) ***
> (2) commence an action at law or equity against the United States concerning the validity of his alleged interest in the property subsequent to the filing of an indictment or information alleging that the property is subject to forfeiture under this section.

21 U.S.C. § 853(k)(2).

In the instant case, Bank One commenced its foreclosure action against the United States subsequent to the United States' filing the indictment that alleged the Constance Property was subject to forfeiture. Based on the plain language of Section 853(k)(2), Bank One cannot bring its civil action against the United States. *See Roberts v. United States*, 141 F.3d 1468, 1470 (11th Cir. 1998) (dismissing civil action pursuant to 21 U.S.C. 853(k)(2) because alleged property was subject to criminal forfeiture).

---

[1] On a motion to dismiss, the court may take judicial notice of court documents which are a matter of public record. *Doherty v. City of Chicago*, 75 F.3d 318, 324 n.4 (7th Cir. 1996).

[2] Subsection (n) allows a third party to challenge a final order of forfeiture entered under Section 853. *See* 21 U.S.C. § 853(n).

2

Based on the above, the United States' motion to dismiss is granted. The Second Amended Complaint to Foreclose Mortgage is dismissed with prejudice.

Dated: _September 12, 2002_

JOHN W. DARRAH
United States District Judge

3

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5045 | **DATE** | 12-13-02 |
| **CASE TITLE** | Bank of New York vs. Rogers et al. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons provided on the reverse of this Minute Order, the United States' motion to dismiss the complaint to foreclose mortgage is granted [doc. no. 7-1]. This case is hereby terminated. Any pending motions are dismissed as moot.

*Ronald A. Guzman*

(11) ■ [For further detail see order on the reverse side of the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | |
| | Notices mailed by judge's staff. | | DEC 16 2002 | | |
| | Notified counsel by telephone. | | date docketed | | |
| X | Docketing to mail notices. | | | docketing deputy initials | 13 |
| ✗ | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT | DEC 16 2002 | | |
| | | | date mailed notice | | |
| LYG-LC | courtroom deputy's initials | 02 DEC 13 PM 5:03 | | mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | | |

(Reserved for use by the Court)

# ORDER

Before the Court is the United States' motion to dismiss the complaint to foreclose mortgage because it is barred by 21 U.S.C. § 853(k)(2). Although the Court has provided plaintiff with ample opportunity to respond to the motion, it has failed to do so and the accordingly, the Court will rule on the motion without the benefit of plaintiff's brief.

21 U.S.C. § 853(k)(2) provides that "no party claiming an interest in property subject to forfeiture under this section may . . . commence an action at law or equity against the United States concerning the validity of his alleged interest in the property subsequent to the filing of an indictment or information alleging that the property is subject to forfeiture under this section."

In *Roberts v. United States*, where an owner of real estate brought an action against the United States challenging the validity of the restraints placed on the real estate in criminal forfeiture proceedings against the owner's husband, the court held that the suit was clearly barred by the plain language of 21 U.S.C. § 853(k). 141 F.3d 1468, 1470 (11th Cir. 1998). The *Roberts* court held that the remedy sought by the owner– "a lifting of the *lis pendens* and the protective order–is properly sought only in the court in which the criminal forfeiture case is pending." *Id.* at 1471.

The Court sees no significant distinction between the facts in Roberts and the facts in this case. As in *Roberts*, plaintiff in the instant case seeks, in essence, to lift the *lis pendens* regarding the real property at issue in the criminal case against Hugh Rogers. Plaintiff also seeks, among other things, to have this Court enter a judgment of foreclosure of the mortgage on said property and enter an order granting plaintiff (or a receiver) possession. This is precisely the type of case that Congress sought to bar when it enacted 21 U.S.C. § 853(k)(2). Therefore, the government's motion to dismiss is granted.

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6419 | **DATE** | 11/21/2000 |
| **CASE TITLE** | LIBERTY FEDERAL BANK vs. J.C.J. VENTURES, INC. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **The motion to dismiss [3-1] is granted. This action is dismissed with prejudice. SEE REVERSE FOR DETAILS.**

*Suzanne B. Conlon*

(11) ■ [For further detail see order on the reverse side of the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | NOV 2 4 2000 | |
| | Docketing to mail notices. | | date docketed | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 11/21/2000 | |
| | | FD-7 FILED FOR DOCKETING 00 NOV 22 PM 2: 33 | date mailed notice | |
| SB | courtroom deputy's initials | | jad | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |



(Reserved for use by the Court)

# ORDER

Liberty Federal Bank ("Liberty") brought suit to foreclose a mortgage on property commonly known as 1326-28 W. Madison, Chicago, Illinois ("the Madison property") in the Circuit Court of Cook County, Illinois. Count 1 of Liberty's complaint seeks foreclosure of the Madison property as security for a $500,000 loan that is in default. Count 1 names as defendants all parties who may have an interest in the property. Included among these defendants are Clarence Cross IV and the United States. The United States ("the government") removed the case to this court pursuant to 28 U.S.C. §§ 1442 and 1444.

Liberty's complaint seeks to terminate the government's interest in the Madison property, described as:

> United States of America['s interest], pursuant to the Lis Pendens notice recorded November 9, 1999 as Document No. 90957352 and pursuant to Case No. 99 CR 836.

Compl. at ¶¶ 1 and 3(1). The *lis pendens* was filed to provide public notice of the government's forfeiture action against the Madison property in *United States of America v. Clarence Cross, et al.*, 99 CR 836, (N.D. Ill., Judge Manning). On November 4, 1999, a federal grand jury returned a superseding indictment against Cross and several co-defendants, charging them with criminal activity including mail fraud. The indictment further sought criminal forfeiture of the Madison property under 18 U.S.C. § 982. The government moves to dismiss Liberty's complaint pursuant to Fed. R. Civ. Proc. 12(b)(1). The government argues Liberty may only assert its claim for foreclosure and challenge the government's interest in the Madison property by petitioning the court hearing the forfeiture claim.

A motion to dismiss tests the sufficiency of the complaint, not the merits of the suit. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). Therefore, the court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in Liberty's favor. *Zimmerman v. Burch*, 494 U.S. 113, 118 (1990). The court will dismiss a claim only if "it appears beyond doubt that [the plaintiff] can prove no set of facts in support of his claim which would entitle him to relief." *Colfax Corp. v. Ill. State Highway Auth.*, 79 F.3d 631, 632 (7th Cir. 1996).

Liberty first argues the government's motion to dismiss should be denied because it fails to satisfy Fed. R. Civ. Proc. 7(b)(1)'s requirement that a motion "shall state with particularity the grounds therefor." Liberty asserts the motion does not specify any basis upon which this court could find it lacks jurisdiction. This argument is frivolous. The government's motion incorporates a supporting memorandum of law stating specific grounds for dismissal. A memorandum filed "contemporaneous with the motion fulfills the requirement of Fed.R.Civ.P. 7(b)(1) that motions papers 'state with particularity the grounds' for the relief demanded." *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Wisconsin*, 957 F.2d 515, 517 (7th Cir. 1992).

Liberty's second argument is equally frivolous. The criminal charges were brought under 18 U.S.C. § 1341 (not 18 U.S.C. §§ 1964 and 1965 as asserted by Liberty). In a separate count, the government requests criminal forfeiture under 18 U.S.C. § 982. That statute provides, in relevant part, "the court, in imposing a sentence on a person convicted of violation of . . . section 1341 . . . shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation." 18 U.S.C. § 982 (a)(2). The statute further provides, "[t]he forfeiture of property under this section . . . . shall be governed by the provisions of section 413 (other than subsection (d) of that section) of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853)." 18 U.S.C. § 981(b)(1). In turn, 28 U.S.C. § 853(k) provides, "no party claiming an interest in property subject to forfeiture under this section may – (2) commence an action at law or equity against the United States concerning the validity of his alleged interest in the property subsequent to the filing of an indictment or information alleging that the property is subject to forfeiture under this section." Rather, "[a]ny person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may . . . petition the court for a hearing to adjudicate the validity of his alleged interest in the property." 21 U.S.C. § 853(n)(2).

These statutes make it clear that Liberty's only recourse is to petition the court with jurisdiction over the criminal forfeiture claim. Liberty may not file a separate civil suit before this court to challenge the forfeiture. 21 U.S.C. § 853(k)(2); *see also United States v. Phillips*, 185 F.3d 183, 184 (4th Cir. 1999); *United States v. Security Marine Credit Corp.*, 767 F.Supp. 260, 263 (S.D.Fl. 1991).

Liberty argues 21 U.S.C. § 853 does not apply because subsection (a) states that forfeitures under the Comprehensive Drug Abuse and Prevention and Control Act only apply to a "person convicted of a violation of this subchapter or subchapter II of this chapter." Liberty further alleges subsection (n)(1) and (k) state that those provisions apply only to violations "under this section." Thus, Liberty argues, § 853 applies only to violations of the Comprehensive Drug Abuse and Prevention and Control Act. This argument would render the provisions of § 982 a nullity. The section clearly states that forfeiture of property under offenses set forth in the section, including mail fraud, are governed by § 853. It would belie common sense to then read § 853 not to apply to offenses explicitly set forth in § 982. Rather, the common-sense approach is to read § 853 to incorporate the offenses set forth in § 982. *See e.g.*, *United States v. Phillips*, *supra* at 184 (indictment for interstate transportation of stolen property, a crime enumerated in § 982, allowed government to secure a criminal forfeiture of the assets involved).

In sum, § 853(k) applies to and bars Liberty's claim to foreclose a mortgage on the Madison property.

Suzanne B. Conlon